708 P.2d 1297

**In the Matter of a Member of the State Bar of Arizona, Robert T. NEVILLE, Respondent.**

**No. SB–316.**

Supreme Court of Arizona, En Banc.

Sept. 23, 1985.

F. William Sheppard, Phoenix, for State Bar.

Philip E. von Ammon, Phoenix, for respondent.

FELDMAN, Justice.

Respondent Neville was charged with violations of the Code of Professional Responsibility Rule 29(a), Rules of the Su-

preme Court, 17A A.R.S.[1] A formal complaint was filed against respondent on January 28, 1983 in three counts. A hearing was held before State Bar Local Administrative Committee for District 5H (Committee) on May 3 & 4, 1983. The Committee concluded that the violations charged in Counts One and Two were substantiated and recommended that respondent be suspended from the practice of law for ninety (90) days. Respondent objected to the Committee's original and amended Findings of Fact and Conclusions of Law and Recommendations. Those objections were heard by the Disciplinary Board (*see* Rule 36(b)) which voted to accept the Committee's Recommendations as to Counts I, II and III and recommended a sixty-day suspension. Respondent filed objections to the report and recommendation of the Disciplinary Board (*see* Rule 37(a)), thus bringing the matter before us for review. (*See* Rule 37.)

We approach the proceeding as trier of both fact and law in the exercise of our supervisory responsibility over the State Bar. *In re Mercer*, 133 Ariz. 391, 393, 652 P.2d 130, 132–33 (1982). We are guided by a standard of clear and convincing evidence, although the findings of the State Bar are entitled to deference and serious consideration. *Id.; In re Moore*, 110 Ariz. 312, 313, 518 P.2d 562, 563 (1974). The Committee and the Board concluded that respondent had violated Disciplinary Rules 5–104(A), 5–105 and 2–102(C). In general, these rules regulate a lawyer's business relationships with his client (5–104(A)), multiple representation of adverse interests (5–105) and the use of professional letterheads and notices (2–102(C)).

## FACTS

The facts giving rise to this matter are complex and clearly illustrate the inherent risks to an attorney who conducts business with his client when their interests are adverse. *In re Bentley*, 141 Ariz. 593, 596, 688 P.2d 601, 604 (1984).

Respondent Neville was admitted to practice law in the State of Arizona in 1964 and has been a member of the State Bar ever since. Floyd Bly is a retired pharmacist who lived in Arizona from 1971 to 1981. He was a licensed real estate broker in Minnesota and was also licensed in Arizona in 1978. He is a knowledgeable and sophisticated real estate investor, but has no legal training. Bly first retained respondent in 1971, and they had an ongoing attorney-client relationship until approximately 1981. Respondent performed work for Mr. Bly on numerous transactions, although he was not Bly's sole legal counsel. Mr. Bly frequently purchased real estate and either exchanged it or sold it on deferred payments evidenced by note or contract. It would be fair to say that Bly was more of a trader than an investor.

The charges are based on three related transactions. The first (Count I) involves property called "Camp Phoenix" on East Van Buren Street in Phoenix. Bly exchanged Camp Phoenix for property in Chandler Heights which he simultaneously sold to respondent in exchange for respondent's promissory note. The second charge (Count II) involves respondent's representation of both Bly and another party in the original purchase of Camp Phoenix and respondent's subsequent representation of the other party in a bankruptcy action. The third charge (also Count II) involves respondent's use of stationery holding himself out as a partner in a partnership which never existed.[2]

The Camp Phoenix property has a complex history. Mr. Bly obtained it and some undeveloped land in Litchfield Park in exchange for his interest in a promissory note secured by property in Idaho. Respondent acted as counsel in this transaction. Mr. Bly testified that respondent represented the seller in this transaction, a Mr. Kay,

---

1. Rules of the Supreme Court will hereafter be referred to as "Rule _____."

2. There was other conduct charged in Count Three which will not be discussed here because the Committee properly found that respondent did not neglect a legal matter entrusted to him.

but that he (Bly) had retained Neville prior to this time for other matters. The record is unclear on this point. The Committee found that respondent represented Bly in the acquisition.

Mr. Bly operated Camp Phoenix as a motel and trailer park and then sold it to the manager, a Mr. Cummings, in 1975. Mr. Neville prepared the documents necessary to effectuate this transaction. Mr. Bly thought that respondent was his lawyer in this matter. Mr. Cummings had no independent legal advice and testified that he, too, considered respondent to be his lawyer. Respondent never clarified who he thought he represented in this transaction, but his testimony is consistent with that of Cummings as to respondent's statement that he would be unable to represent either party in any later dispute. Cummings thereafter defaulted on his obligations to Bly, who then asked respondent to represent him in a lawsuit to regain possession of the property and to obtain a deficiency judgment from Cummings for the balance due. Respondent refused and sent Bly to Attorney Ferrin who pursued the matter. Bly regained possession of Camp Phoenix and on November 5, 1976 obtained a judgment against Cummings for $60,550.25.

Respondent later obtained an interest in the Camp Phoenix property by purchasing options from Bly. The options, drafted by respondent, have not been introduced into evidence. As consideration for the first option, respondent gave his promissory note for $5,000, eventually paid half by jewelry and half by credit against legal fees which Bly owed to respondent. Respondent purchased the option based on plans to develop the property as a government motor pool, however the government subsequently purchased an adjacent property. Thereafter, respondent drafted a second option, hoping to develop the property with mini-warehouses. This development would have required that Bly subordinate his security for respondent's debt to a construction loan. Respondent put considerable effort into the project, got the property rezoned, but was unable to make the financial arrangements necessary to bring the project to fruition.

At this time the Lau family agreed to purchase Camp Phoenix from Bly in exchange for property they owned in Chandler Heights plus $25,000 in cash. Apparently respondent initiated this transaction, seeking permission from Bly to sell his option to the Lau group. Bly did not want title to either the Camp Phoenix or the Chandler property; accordingly, the transaction was structured so that the Laus paid Bly $25,000 cash and conveyed the Chandler Heights property to him in return for his conveyance of Camp Phoenix to them. Simultaneously, Bly transferred the Chandler Heights property to respondent in exchange for respondent's note for $257,774. Bly's participation was conditioned upon respondent's purchase of the Chandler Heights property.

Respondent drafted the contract for all the parties. It is undated, but was notarized on June 15, 1976 and signed by respondent, Lau, and Bly. Respondent testified that he told them that as a principal he could not represent any of them in the transaction and that they should each get independent counsel. The Laus were advised by a CPA and independent legal counsel. Mr. Bly was not. Nevertheless, respondent continued with the transaction. Bly stated that he thought respondent represented him in these transactions and denied that respondent advised him to the contrary. He admitted knowing that respondent and he had adverse interests.

Clause 2 of the agreement between Bly, Lau and respondent provides that

Bly does hereby grant, bargain, sell and convey to NEVILLE the [Chandler] property ... for a total consideration of Two Hundred Fifty-Seven Thousand Seven Hundred Seventy-Four Dollars ($257,774) by promissory note and deed of trust payable as follows: Said $257,774 shall bear interest at the rate of eight percent (8%) per annum beginning thirty (30) months from the date of this Agreement. Said interest will be payable semiannually beginning thirty-six (36) months from

the date of this Agreement. The balance shall become due only upon the contingency that NEVILLE sell said property and only to the amount of the pro rata amount of actual cash or trade received as to the total purchase price of said property. NEVILLE agrees not to sell said property for less than $257,774.

Bly created the substantive terms, and respondent accepted these terms with no negotiation. For the most part, these provisions were later included in the standard form escrow agreement dated June 5, 1978, prepared by Minnesota Title Company, and in the formal "Agreement for Sale" of the Chandler Heights property from Bly to respondent. The record does not indicate who drafted the Agreement for Sale.

Subsequently Bly telephoned respondent and complained that respondent's personal obligation on the instrument evidencing the purchase price had been omitted from the agreement. Bly was concerned that if respondent sold the property to a third party who later defaulted, Bly would have no choice but to take possession of the land, which he did not want. Neville responded by confirming, on stationery bearing the name of Ferrin & Neville, the oral understanding that he was personally obligated for the amount of $257,774.

■ Respondent later sold the Chandler Heights property to Reeder and Shill who made the interest payments to Bly as required under respondent's contract. Respondent also received at least $42,000 in cash from the Reeder/Shill sale, none of which was paid to Mr. Bly. In 1981 Bly learned of the sale and wrote respondent to demand his pro rata share of the proceeds. Respondent had no funds, and Bly then filed a complaint with the State Bar. After receiving the initial notice of the complaint, respondent wrote to the Committee explaining that he had not paid Bly from the Reeder/Shill downpayment because he owed Bly no portion of these funds. However, respondent later acknowledged at the Committee hearing that he did owe Bly a portion of the funds, but had failed to pay

because he had forgotten about the pro rata provision and had spent the money on other things. There were other inconsistencies between respondent's letter to the Committee and his sworn testimony before the Committee, all of which affected the Committee's view of the credibility of respondent's testimony on the points where it conflicted with Bly's. We note that the requirement of clear and convincing evidence can be met even if there is a direct conflict between the testimony of the lawyer and that of the client. *In re Weiner*, 120 Ariz. 349, 353, 586 P.2d 194, 198 (1978).

### THE CAMP PHOENIX TRANSACTION—DR 5–104(A)—DEALING ADVERSELY WITH ONE'S CLIENT.

The Committee concluded that respondent had transacted business with Bly when their interests were adverse without making full disclosure.

DR 5–104(A) provides as follows:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

It is important to note that the rule does not apply to investments and transactions in which the lawyer and client do not have adverse interests. In the relationship of buyer and seller, however, such as in the present case, the parties' interests are clearly adverse and thus the rule applies. We must determine, therefore, whether the evidence establishes a violation of the other elements of the rule. Those which are disputed in the present case are:

a. Was Bly respondent's "client?"

b. Did Bly expect respondent to exercise his professional judgment for Bly's protection?

c. Are the rule's conditions satisfied because Bly consented "after full disclosure?" What is "full disclosure?" [3]

3. We note that ER 1.8 of the new Disciplinary Rules (adopted effective February 1, 1985, and

## A. *Was Bly Respondent's "Client?"*

■ There is some question about whether respondent advised Bly that he was not acting as Bly's attorney. The Committee made no express finding on this question. Bly is not an unsophisticated, occasional purchaser of real estate. He admitted realizing that respondent's interests in the transaction were adverse to his own. One would assume that an experienced real estate investor who had dealt with attorneys in numerous transactions would not only realize this, but would also realize that an attorney cannot ordinarily represent both sides in the same transaction. We do not believe that the evidence against respondent rises to the level of "clear and convincing" on this issue. Clear and convincing evidence is that which may persuade that "the truth of the contention is 'highly probable'," *In re Weiner*, 120 Ariz. 349, 353, 586 P.2d 194, 198 (1978) (quoting *McCormick on Evidence* § 340(b) (2d ed. 1972). We think it quite likely that Bly was told or at least knew that respondent, the buyer, was not also undertaking to act as Bly's attorney.

However, Bly's knowledge does not resolve the question of whether respondent was engaged in a business transaction in which his interests were adverse to those of his "client." The rule does not expressly limit its applicability to situations in which the lawyer represents the client in the very transaction in which their interests differ. We believe that the rule should not be so limited for several reasons. First, the rule is grounded in the fiduciary duty owed by an attorney to his client. That duty continues beyond the completion of any particular matter which the attorney undertakes for the client. The fiduciary duty arises when the attorney-client relationship is established and continues until it is abandoned. Abandonment is found when the lawyer's influence over the client has dissipated. Thus, DR 5–104 is applicable "as long as the influence arising from an attorney-client relationship continues." *In re McGlothlen*, 99 Wash.2d 515, 523, 663 P.2d 1330, 1335 (1983). Second, the policy expressed by DR 5–104 is based on the realization that those who consider themselves clients come to depend upon the confidentiality and fairness arising from their relationships with their attorneys. They do not take a transactional approach to these relationships, turning their confidence on and off at the end of each transaction. Clients can be expected to assume that one whom they have come to look upon as "their lawyer" will protect them or, at least, not harm them. A lawyer's analytical training may permit expansion or limitation of professional obligations as circumstances warrant, but clients are usually neither required nor trained to make so careful an analysis. In any event, the profession prefers that its clients continue to repose confidence in their lawyers even after the immediate case has been finished, partly, no doubt, in the expectation that when the next case arises the clients will return. *See In re Jans*, 295 Or. 289, 294–295, 666 P.2d 830, 833 (1983). A third objective served by the rule is the hope that clients will obtain full disclosure on which to base their decision in all transactions. This objective is not served by a narrow, transactional application of the rule to situations in which the attorney is formally acting as counsel for the client. *In re James*, 452 A.2d 163, 167 (D.C.1982), *cert. denied*, 460 U.S. 1038, 103 S.Ct. 1429, 75 L.Ed.2d 789 (1983). *See also In re Montgomery*, 292 Or. 796, 643 P.2d 338 (1982).

■ We hold, therefore, that application of DR 5–104(A) is not limited to those situations in which the lawyer is acting as counsel in the very transaction in which his interests are adverse to his client. It applies also to transactions in which, although the lawyer is not formally in an attorney-client relationship with the adverse party, it may fairly be said that because of other transactions an ordinary person would look to the lawyer as a protector rather than as an adversary. The provisions of DR 5–104(A) apply so long as

inapplicable to the events in question) requires that disclosure and consent be in writing.

the client may reasonably feel that he is dealing with a person whose advice and counsel should be given weight and respect, rather than as one whose words must be taken with that grain of salt that the law expects from people dealing with those who are not fiduciaries. We recognize that we paint broadly, that lawyers are provided no bright line by which to determine when they can act as ordinary business people in relation to the interests of those whom they have represented in the past or whom they represent on other matters at the present.[4] No doubt, we make it more difficult for lawyers to deal adversely with past and present clients. We believe that this result conforms to the obligation of the profession and is in the public interest.

■ It is appropriate to note at this point that the evidence does not permit a finding that respondent intended to defraud his client. We do not believe this to be of consequence. The rule contains no words which limit its applicability to cases where scienter is shown. The rule is not intended to deter and punish actual fraud alone. Other rules (see, e.g., DR 4–101(B)) proscribe fraudulent conduct damaging the client. The objectives of DR 5–104 are served by holding that the rule is applicable even in situations in which the attorney did not intend to defraud or act with improper motives. In re Weiner, supra; In re James, supra.

**B.** *Did Bly Expect Respondent To Exercise His Professional Judgment for Bly's Protection?*

The resolution of this question is substantially controlled by the determination of the existence of the attorney-client relationship. It is natural and proper for a client with a longstanding business relationship with a lawyer to feel that the lawyer is to be trusted, will not act unfairly, and will protect him against danger. This is true even though he knows that the lawyer is not representing him in the particular transaction and the lawyer is drawing papers for the use of both parties. *In re James, supra.* We believe the Committee's findings on this point are well supported by the record.

**C.** *Did Respondent Make Full Disclosure and Obtain Bly's Knowing & Voluntary Consent?*

We assume that respondent actually did tell Bly—or Bly realized—that respondent was not acting as Bly's attorney in the transaction in question, and that Bly should get independent counsel. Is this the "full disclosure" required by the rule? We think not. The words "I am not representing you in this matter" may convey a great deal to another lawyer, but their full legal import will escape most laymen. The lay person may realize that the lawyer is not representing him and that he will not have to pay for legal services, but he may not recognize that he is in a situation where he

**4.** We do not determine here when the relationship of "attorney and client" formed in other transactions has so dissipated that the requirements of DR 5–104 no longer apply to a specific transaction. Whether the relationship has dissipated entirely is a question which must necessarily be resolved on a case-by-case basis. Clearly, the more work that has been or is being done by the lawyer for the client and the longer the period of time involved in representation of that client, the more likely it will be that their relationship will be characterized as one of "attorney and client" even where the lawyer is not formally acting as attorney in the transaction under consideration. Also, the nature and similarity of other transactions in which the lawyer has represented the client in relation to the one being entered into are relevant factors. The sophistication of the client must be considered; some clients are much better able to understand changes in fiduciary relationships and obligations than others. Finally, and perhaps most important, is the presence or absence of independent counsel for the client in the very transaction under consideration. Where the client is represented by another lawyer, ordinarily it will be much easier to find that he either did not have reasonable grounds to expect the former lawyer to protect him or that the former lawyer's status or relationship did not influence the client's decisions in the transaction under consideration. *See In re Montgomery*, 292 Or. at 804, 643 P.2d at 342; *In re McGlothlen*, 99 Wash.2d at 524–25, 663 P.2d at 1335.

must protect himself from his own lawyer. Justifiably, he may continue to repose confidence in the person who usually acts as "his lawyer" and feel that he can be trusted to do nothing unfair or harmful. In short, the confidence which lawyers wish to engender in their clients may still exist and the consequent influence may extend to the transaction. We believe, therefore, that the requirement of "full disclosure" means much more than advising the client that he is not being represented in the particular transaction.

◼ Thus, even accepting respondent's version of the disclosure, he failed to make full disclosure as required by the Disciplinary Rule. We adopt the view of the cases which hold that full disclosure requires not only that the lawyer make proper disclosure of non-representation, but that he also must disclose every circumstance and fact "which the client should know to make an intelligent decision concerning the wisdom of entering the agreement." *Committee on Professional Ethics v. Mershon*, 316 N.W.2d 895 (Iowa 1982). The rule is strict. The lawyer must give the client that information which he would have been obliged to give if he had been counsel rather than interested party, and the transaction must be as beneficial to the client as it would have been had the client been dealing with a stranger rather than with his lawyer. *In re McGlothlen*, 99 Wash.2d at 525, 663 P.2d at 1335. Thus, "full disclosure" requires not only a full explanation of the divergence in interest between the lawyer and the client and an explanation about the need to seek independent legal advice, but also "a detailed explanation of the risks and disadvantages to the client which flow from the agreement." *In re Montgomery, supra.* The "consent" after "full disclosure" required by DR 5-104(A) must be the client's consent, after full explanation, to all terms that are either advantageous to

the lawyer or disadvantageous to the client. *People v. Cameron*, 197 Colo. 330, 595 P.2d 677 (1979).

◼ We believe the Committee was correct in concluding that the agreement drawn by respondent contained terms that were, to say the least, disadvantageous to Bly. These should have been called to his attention, explained and removed from the agreement unless Bly had some reason for wanting the terms to be included. The paragraph in question (set out *ante* at 1300) provides that respondent is to purchase the Chandler Heights property from Bly by issuing a promissory note in the amount of $257,774. The contract contains the following deficiencies which, we believe, no respectable practitioner would have allowed a seller to accept:

(a) The buyer is to pay 8% interest in semi-annual payments, but there are no provisions for remedies in the event of default. The seller is not given the right to accelerate the due date of the principal, nor increase the rate of interest after default. Thus, if the buyer should default on an interest payment, the seller's only remedy is consecutive suits and recoveries for each payment of delinquent interest as it comes due.

(b) The agreement contains no clear provision for the time at which repayment of principal is to occur, nor for the terms on which it is to be paid. The parties contemplated that respondent would pay Bly when respondent sold the property. Respondent conceded to the Committee that he was to have paid Bly by giving him a pro rata share of the sale proceeds upon receipt. The agreement is hopelessly ambiguous as to when, in what proportions or how this was to be done.[5]

(c) The agreement contains no provisions for principal payments if respondent chose not to sell the property or was unable to do so.

---

5. "The balance shall become due ... only to the amount of the pro rata amount ... received as to the total purchase price...."

(d) There is no specific provision for amortization if respondent sold the property on terms which permitted long deferral in payment of the purchase price in return for a high interest rate.

(e) There is no device or structure in the agreement that insured that Bly's share of the sale proceeds would be paid as the same were remitted by respondent's purchaser.

We believe that respondent should have called such problems to Bly's attention and should have explained why they were adverse to Bly's interests. *In re James, supra; Attorney Grievance Commission v. Baker*, 285 Md. 45, 399 A.2d 1347; *People v. Cameron, supra.* Respondent argues, however, that the terms of the transaction were set by Bly and that he should not be subject to discipline for mere acquiescence. We disagree. First, although Bly may have outlined the transaction (including the concept of precomputed interest, payment of principal on sale and the like), respondent drafted the actual agreement between himself and a client with whom he had an ongoing relationship; he was obligated to be fair to and protect his client. The client had no duty to foresee all the dangers inherent in the deal which he had outlined. Respondent's fiduciary duty required that he take no advantage except with his client's "consent" after "full disclosure." We agree with the Committee, therefore, and find that respondent violated DR 5–104(A) in connetion with his purchase of the Chandler Heights property from Mr. Bly.

*Count II—DR 5–105—Representation of Multiple, Adverse Interests.*

The Committee found that respondent had violated the provisions of DR 5–105. In relevant part, that rule provides:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

\* \* \* \* \* \*

(C) In the situations covered by DR 5–105(A) ..., a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure....

The facts pertinent to the charge involve the deficiency judgment which Bly obtained against Cummings upon foreclosure of the Camp Phoenix property, prior to the three-way exchange between Bly, the Laus and respondent. Bly obtained a deficiency judgment in excess of $60,000 and was represented by Mr. Ferrin in the foreclosure action. Some two years later Cummings, the judgment debtor, decided to seek relief under the Bankruptcy Act. Since Bly had reacquired the property through foreclosure, the deficiency judgment was an unsecured claim. Cummings prevailed upon respondent to represent him in the bankruptcy proceedings. Cummings trusted respondent because respondent had represented Cummings on other matters during the period leading up to the bankruptcy problem.

Bly learned of Cummings' bankruptcy problem in a manner that is unclear in the record. It is clear, however, that respondent telephoned Bly to ask for consent to represent Cummings in the bankruptcy proceedings. Respondent recognized that he needed Bly's consent because he represented Bly generally and had, in fact, drawn the closing instruments on the sale from Bly to Cummings. These documents, of course, formed the basis for Bly's default judgment against Cummings. Bly gave his consent, but did so "reluctantly" after being "pressed" by respondent who said that if Bly didn't consent he wouldn't handle the matter but another attorney certainly would.

As an unsecured judgment creditor, Bly had adverse interests to Cummings at the

time of filing. Although the original dual representation was disclosed and consent was obtained, DR 5–105 precluded any later representation without full disclosure and renewed consent. The Committee found that respondent had not obtained knowing and voluntary consent from Bly. Respondent argues that the Committee's findings are not supported by clear and convincing evidence. We disagree.

No writing supported respondent's testimony that he had obtained a valid consent, and no testimony was taken which indicated that Bly was informed of his rights as an unsecured creditor. The absence of a writing weighed heavily with the Committee. We believe this to be proper. An attorney is trained to document his actions. A client usually is not. The attorney knows the importance of the writing and should realize that if the propriety of his acts is subsequently questioned the absence of a writing may make it difficult for the attorney to prove that he did disclose when a client testifies that he did not. Further, the presence of a writing facilitates the client's understanding of the problems. The ambiguities and the pressures inherent in the purely verbal situation will be alleviated by the ability of the client to reflect upon and analyze the writing.

▇▇▇▇ The absolute requirement of a writing was not a part of the rule applicable to the present case.[6] Respondent is not *per se* guilty of a rule violation because of the absence of a writing, although he would be today. However, the Committee found, and we agree, that in the absence of a writing, and on these facts, Mr. Neville could not prove that Bly's consent to respondent's representation of Cummings was voluntary and knowing. The burden of establishing disclosure and consent is on

the lawyer where there has been a conflict of interest. Any doubts and ambiguities which are disclosed in later disputes with the client will be resolved against the attorney. *See In re McGlothlen,* 99 Wash.2d at 523, 663 P.2d at 1335. We agree with the Committee's conclusion that respondent violated DR 5–105.

## DR 2–102(C)

Respondent is charged with use of a letterhead which contained the name of a law partnership (Ferrin & Neville) which never existed. He admitted to the use of this letterhead for approximately one month while he and Mr. Ferrin were on the verge of establishing a partnership which never materialized. However, there is no evidence the letterhead was used for any fraudulent purpose.

▇▇▇ While hesitant to minimize any violation of the Code, we believe that in this case the stationery was used in good faith. Also, there is no indication in the record of any third party reliance. We do not condone the violation and do hold it improper. It does not, however, rise to the level of a serious ethical violation. Therefore, we decline to use it as a factor in considering appropriate sanctions.

## SANCTIONS

The Committee recommended a ninety (90) day suspension. The Board reduced the recommended suspension period to sixty (60) days. We give great weight to the recommendations of both the Committee and the Board, but have the ultimate responsibility for deciding the appropriate sanctions to be imposed for violation of the Disciplinary Rules. *In re Mercer, supra.*

In considering the sanctions to be imposed in this case, we conclude that the most serious violation was that involving

---

**6.** As of February 1, 1985 ER 1.7 replaces DR 5–105. It requires full consent in multiple representations. E.R. 1.8 explains how an attorney can achieve full consent. The attorney must insure that the transaction is fair and reasonable and all terms are fully disclosed to the client; all of the transaction must be in writing; it must be in a form comprehensible to the client; and the client must consent in writing.

Count I, dealing adversely with a client without full disclosure and without obtaining knowing consent. In considering this charge, we give weight to the fact that Bly was aware that respondent did not purport to act for him as an attorney in the three way trade involving the Camp Phoenix and Chandler properties. Respondent's transgression was his failure to make the full disclosure which is required by the interpretation we give to DR 5–104(A). This, of course, is a matter of first impression in Arizona. We note also that there is no evidence of fraudulent intent or knowing violation of fiduciary duty. Nor has there been any damage to the client. Finally, there have been no prior disciplinary violations by respondent during the twenty-one years that he has practiced in this state.

In light of these factors, we believe that suspension is too harsh a sanction. *See In re McGlothlen, supra* (the court refused to impose any disciplinary sanctions in a similar case because of the "relatively undefined nature" of the lawyer's relationship with the client, the lawyer appeared to have acted in good faith, the lack of harm to the client, and because there had been no previous discipline imposed upon the lawyer). The purpose of discipline is to protect the public, the profession and the system of justice. *In re Mercer, supra.* Sanctions are not imposed upon the offending lawyer to punish, but to deter. *Id.* We believe these purposes can be as well achieved in this case by censure as by a short suspension from practice.[7]

We hold, therefore, that the Committee's findings and conclusions are approved. Pursuant to Rule 37(g) respondent is assessed costs of $2,864.18. Respondent is censured.

HOLOHAN, C.J., GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

---

7. Ordinarily, if suspension is warranted, it "should be for a period of time equal to or greater than six months ..." because "short term suspensions with automatic reinstatement are not an effective means of protecting the public. If a lawyer's conduct is serious enough to warrant a suspension from practice, the lawyer should not be reinstated until rehabilitation can be established." Proposed Standard 2.3 and Comment, ABA Standing Committee for Professional Discipline, *Standards For Imposing Lawyer Sanctions: Black Letter Rules*, Discussion Draft, July 1985.