742 P.2d 796

**In the Matter of a Member of the State Bar of Arizona, Robert Alexander PETRIE, Respondent.**

**No. SB–339.**

Supreme Court of Arizona, En Banc.

Sept. 15, 1987.

Reynolds, Rhodes & Golston by Rodger A. Golston, Joe S. Reynolds, Mesa, for respondent.

Sandra Canter, Phoenix, State Bar Counsel.

HOLOHAN, Justice.

This matter comes to us on the objections of the respondent attorney to the findings, conclusions and recommendation of the Disciplinary Commission.

The Local Administrative Committee of the Arizona State Bar after hearing evidence had recommended that respondent be censured for representing clients with adverse interests in violation of Disciplinary Rule 5–105(A) and (B), and for failing to carry out a contract of employment in violation of Disciplinary Rule 7–101(A)(2).[1]

Respondent filed objections to the Committee's findings of fact, conclusions of law and recommendations. The Disciplinary Commission received additional evidence and heard arguments by counsel. The Commission affirmed the Local Committee's findings and conclusions, but the Commission recommended by a vote of five to one, that respondent be suspended from the practice of law for thirty days. The dissent favored the Local Committee's recommendation of censure.

This matter requires that we answer two questions:

 1. Did respondent violate conflict of interest rules by representing multiple clients in an adoption proceeding?

 2. If so, is a thirty-day suspension the appropriate sanction?

I

■ Our duty in State Bar disciplinary proceedings is to determine the facts and law independently while giving serious consideration to the findings and recommendations of the Disciplinary Commission and the Local Administrative Committee. *See In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). The evidence of unpro-

fessional conduct must be clear and convincing to justify disciplinary action. *Id.; In re Moore*, 110 Ariz. 312, 313, 518 P.2d 562, 563 (1974). Evidence is clear and convincing when its truth is "highly probable." *Neville*, 147 Ariz. at 111, 708 P.2d at 1302 (citations omitted).

The complainants, Gregory and Barbara Pietz (Pietzes) consulted with respondent on July 21, 1981 to express their interest in adopting an infant child. Respondent told the Pietzes that he did not know of any infants available at that time. The Pietzes and respondent agreed that if the Pietzes located a baby for adoption, respondent would represent them in the adoption. The Pietzes paid $30 for this consultation.

The Committee found that shortly before January 26, 1983, the Pietzes received information from a long-time friend, Carolyn Iverson, about a child that would be available for adoption. The Pietzes asked Iverson to make an appointment for respondent to meet with the natural mother, and to inform the respondent specifically that the mother was being referred by the Pietzes. Iverson called respondent, advised him that she had found a baby for the Pietzes, and made an appointment for respondent to meet with the natural mother. The Pietzes had moved to Sierra Vista sometime after their meeting with respondent, so Iverson gave respondent the Pietzes' current address and telephone number in Sierra Vista. She also told him that the Pietzes had become certified by the State of Arizona as acceptable to adopt children.

Respondent testified that he received a call from a woman who advised him of the baby and that "she knew of someone who was interested in an adoption," namely the Pietzes. Respondent claims he did not recognize the Pietzes' name from their visit one and a half years earlier.

The evidence indicates that respondent met with the natural mother and her sister, and he advised them that he had a set of adoptive parents in mind. On January 26,

---

**1.** The alleged infractions in this case took place prior to the 1984 Revision of Supreme Court Rules; thus, the substantive issues will be governed by the Code of Professional Responsibility, Rule 29(a) of the former Supreme Court Rules, 17A A.R.S.

1983, he wrote to the Pietzes, telling them that he had recently interviewed a woman who intended to place a child for adoption and that the Pietzes' names were given when the interview was arranged. Respondent inquired in the letter whether the Pietzes were interested in the adoption. Respondent received a written response on February 3, 1983, in which the Pietzes stated that they were interested in adopting the child, that they were certified by the State to adopt children, and that they were very hopeful concerning the present situation. The Pietzes' letter disclosed knowledge of facts about the natural mother that respondent had not conveyed to them in his original correspondence. Respondent interpreted the Pietzes' letter as "equivocal" because the Pietzes had questions about the adoption and the fees.

Shortly thereafter, respondent received a phone call from another couple, the Buckmasters, who expressed an interest in adopting a second child. In response to respondent's inquiry on February 18, 1983, the natural mother's sister stated that the mother had no obligation to the Pietzes. At respondent's recommendation, the mother agreed to place the baby with the Buckmasters. The Committee found that respondent recommended placement with the Buckmasters because they were more cooperative than the Pietzes and they were locally situated. In addition, respondent was not "excited" about making two appearances in Cochise County, which may have been necessary if the Pietzes were to adopt the child.

When the Pietzes learned from Iverson that the child was going to another couple, Mr. Pietz called respondent, and respondent advised Mr. Pietz for the first time that he had recommended to the natural mother that the child be placed with someone else. Mr. Pietz told respondent that the Pietzes had referred the child to the respondent and consequently they wanted the child placed with them. Respondent refused to do so. Mr. Pietz then initiated this complaint with the State Bar.

## II

### REPRESENTATION OF CLIENTS WITH ADVERSE INTERESTS

The complaint charged that the respondent violated Disciplinary Rule 5–105(A) and (B), which provides:

**DR 5–105. Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer**

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C).

### A. *Potential Conflicts of Interest*

It is common for the parties to an independent adoption to retain an attorney to represent their individual interests.[2] The adoption proceeding itself is unusual because generally the parties to the adoption—the natural parents and the adoptive parents—are not in a true adversary relationship. Usually, both sides in the proceeding have complementary interests and no real negotiating or posturing is neces-

---

**2.** Independent (i.e., non-agency) adoptions are permitted by statute in Arizona. It is not alleged that respondent violated the adoption statute, which provided:

D. Any attorney licensed to practice in this state may perform legal services in an adoption proceeding if he does not receive any compensation or thing of value, directly or indirectly beyond a reasonable fee, approved by the court, for legal services rendered, which fee shall not include any compensation for participation in the finding, locating or placing a child for adoption or for the finding of adoptive parents.

A.R.S. § 8–126(D) (1974) (amended and renumbered by Laws 1985, Ch. 243, § 9, effective Jan. 1, 1986; now A.R.S. § 8–130(C) governs independent adoptions performed by attorneys).

sary; in most cases the natural parents want to find a good home for the baby and need to have the birthing expenses paid, and the adoptive parents want to provide a home for the baby and are willing to pay the expenses. Legal counsel is necessary only to facilitate the exchange and ensure that the legal requirements are met.

 Despite the spirit of cooperation often present in an adoption, conflict of interest situations are likely to arise for an attorney involved in the proceedings. First, the interests of potential adoptive parents of the same child are always adverse to one another. In a situation involving independent sets of adoptive parents and only one available child, obviously one set of parents will be disappointed. An attorney cannot simultaneously represent both sets of adoptive parents without compromising his representation of one of them.

Second, and perhaps less apparent, the interests of the adoptive parents may be adverse to the interests of the natural parents. The decision to give the baby up for adoption is often a difficult one to make. The natural parents' attorney has a duty to provide them with counsel about such matters as paternity issues, economic matters, and the legal effect of signing the consent to adopt. *See* Howe, *Adoption Practices, Issues, and Laws 1958–1983*, 2 FAM.L.Q. 173, 184 (Summer 1983) (citing *Policy Statements Regarding Family Law Approved by ABA Board of Governors*, 1 FAM.L.Q. 105, 108 (June 1967)). Under our statute, the natural parents' consent to the adoption is not valid unless it is given at least 72 hours after the birth of the child. A.R.S. § 8–107(B). The statute protects the right of the natural parents to withhold a decision on whether to keep the baby until after the baby is born. The attorney must counsel the natural parents on the adoption decision right up until the natural parents consent to the adoption. Clearly, the adoptive parents want the natural parents to consent to the adoption rather than to keep the baby. It is obvious, therefore, that the natural parents' interests may be adverse to the interests of

the adoptive parents, and the same attorney cannot represent both parties. *See* Op. No. 72–2 (Jan. 26, 1972) and Op. No. 94 (Feb. 12, 1962), Comm. on R. Prof. Conduct, Ariz. State Bar.

 Notwithstanding the foregoing discussion, in some instances an attorney may be able to represent multiple parties in an adoption proceeding. Disciplinary Rule 5–105(C) provides for an exception to the dictates of DR 5–105(A) and (B). It provides that a lawyer may represent multiple clients "if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 5–105(C). Under this exception, then, it may be possible for an attorney to represent multiple parties to an adoption, but only after full disclosure and upon consent of the parties. This exception has no application to the current case, however, because there is no evidence that respondent complied with its provisions.

B. *Existence of Attorney-Client Relationships*

The Disciplinary Commission found that respondent created an attorney-client relationship first with the Pietzes, and later with the Buckmasters. Respondent contends that he only represented the natural mother. If Petrie simultaneously had an attorney-client relationship with more than one of the parties involved in the adoption—the Pietzes, the Buckmasters, or the natural mother—Petrie has violated DR 5–105(A) or (B).

 An attorney-client relationship does not require the payment of a fee but may be implied from the parties' conduct. 7 Am.Jur.2d *Attorneys at Law* § 118 (1980); *In re McGlothlen*, 99 Wash.2d 515, 522, 663 P.2d 1330, 1334 (1983). The relationship is proved by showing that the party sought and received advice and assistance from the attorney in matters pertinent to the legal profession. 7 Am.Jur.2d *Attorneys at Law* § 118. The appropriate test is a subjective one, where "the court

looks to the nature of the work performed and to the circumstances under which the confidences were divulged." *Alexander v. Superior Court,* 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984), citing *Developments of the Law—Conflicts of Interest in the Legal Profession,* 94 HARV.L.REV. 1244, 1321–22 (1981). An important factor in evaluating the relationship is whether the client thought an attorney-client relationship existed. *Alexander,* 141 Ariz. at 162, 685 P.2d at 1314. The relationship is ongoing and gives rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand that the relationship is no longer depended on. *In re Weiner,* 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978).

### 1. *The Pietzes*

■ The record contains clear and convincing evidence that respondent became the Pietzes' attorney for handling the adoption. At their initial meeting, respondent agreed to represent the Pietzes if they found a baby to adopt. Clearly, the Pietzes sought out respondent's legal assistance at that time. In referring the pregnant woman through Iverson to respondent for independent placement, the Pietzes had every reason to rely on respondent's original promise that he would represent them in the adoption. Furthermore, the referral of the natural mother by the Pietzes indicates that they understood that the attorney-client relationship with respondent was ongoing. The relationship was not terminated until they wrote to respondent in June 1983, and expressly stated they were discharging him as their attorney.

Even accepting respondent's argument that an attorney-client relationship was subject to the condition that the Pietzes locate a baby, correspondence between the respondent and the Pietzes immediately after respondent's first meeting with the natural mother belies respondent's contention that he did not know that the natural mother had been referred to him by the Pietzes. Respondent's letter to the Pietzes indicated that the person who had made the appointment for the natural mother indicated that the Pietzes might be interested in the adop-

tion. Furthermore, respondent stated in the letter, "I would not expect to have any problem in placing the child but I thought we should write to determine your interest in the placement." The Pietzes unequivocally stated in their response that they were *"very* hopeful" to adopt the baby. In addition, in their letter the Pietzes alluded to circumstances regarding the natural mother which were not communicated to them by respondent in his original letter. If nothing else, respondent surely should have realized from their letter that the Pietzes were involved in the referral of the baby's mother.

Respondent also argues that no attorney-client relationship developed because the Pietzes were "equivocal" in their response. He points to the Pietzes' questions about when the baby was due, what their expenses in the adoption would be, and where the father of the unborn child fit in. We find that these were natural questions by any prospective adoptive parents and they do not negate the existing attorney-client relationship. Instead, they reinforce the existence of a relationship because they are evidence that the Pietzes continued to seek legal advice from respondent. Furthermore, the fact that the Pietzes wrote back to respondent within eight days to indicate their desire to adopt the child is inconsistent with respondent's characterization of the Pietzes' response as "equivocal."

We agree with the Commission's finding that there was an attorney-client relationship between respondent and the Pietzes.

### 2. *The Buckmasters*

■ The Commission found that an attorney-client relationship later developed between respondent and the Buckmasters. We agree. Mr. Buckmaster testified that he believed that he and his wife were respondent's clients. They met with respondent regarding the adoption and understood that if the natural mother consented, respondent would perform the adoption for them and they would pay the necessary fees. The fact that respondent never actually performed the adoption of the baby

does not nullify the existence of an attorney-client relationship.

### 3. *The Natural Mother*

█ Respondent agrees that he and the natural mother had an attorney-client relationship. Although the mother was not liable to respondent for legal fees, clearly the natural mother came to respondent seeking legal advice and she received that advice from respondent.

### C. *Violations of DR 5–105*

We find that respondent violated DR 5–105 by representing the Buckmasters in the same matter in which he was already counsel for the Pietzes. Respondent had a duty to advocate for the Pietzes in the adoption proceeding. The natural mother's indication that she was *not committed* to the Pietzes did not lessen the respondent's duty of loyalty to them. The respondent breached that duty when he accepted proffered employment from the Buckmasters and recommended them as adoptive parents to the natural mother. It is difficult to imagine an action by respondent that would have been more adverse to the Pietzes' interest in the adoption. By accepting employment from the Buckmasters while already representing the Pietzes in the same adoption proceeding without full disclosure and consent, respondent violated DR 5–105(A); by continuing in the simultaneous representation and by ultimately recommending the Buckmasters over the Pietzes, respondent violated DR 5–105(B).

We find that respondent also violated DR 5–105 by representing both the natural mother and the adoptive parents in an adoption proceeding. Respondent claimed that he always represented the natural mother in adoption proceedings. From his testimony, it appears that his usual custom was to maintain a file of potential adoptive parents from which the natural mother who is his client may select the couple best suited to adopt the baby. We do not expressly prohibit this practice. However, the attorney must take special care to avoid violating the ethical rules regarding representation of multiple clients. In this

regard, two ethics opinions of the Arizona State Bar Committee on Rules of Professional Conduct are helpful.

In Op. No. 94, February 12, 1962, the attorney represented adoptive parents in an independent adoption. The attorney advised the natural mother that she could obtain her own counsel; however, no lawyer purporting to represent her contacted the attorney in question. The attorney subsequently obtained the natural mother's written consent to adopt, after advising both her and the alleged father of its legal effect. The attorney then assisted in placing the child in the physical control of the adoptive parents, filed the petition to adopt, and accepted a $200 fee for his services. The committee opined that in considering how far the attorney can ethically participate in bringing about the ultimate adoption decree, "[n]aturally, an attorney cannot represent both the natural parent and the adopting parents, and cannot conduct a baby brokerage business under the guise of practicing law." The committee found no unethical activity, however, because the lawyer made clear who he represented and advised the nonrepresented party to seek independent counsel.

In Op. No. 72–2, January 26, 1972, the attorney who requested the opinion gave a detailed description of his adoption procedures. Before placing babies, who were usually referred to him by an obstetrician, the attorney reviewed the prospective parents' qualifications. He also explained his fee structure to either the adoptive parents or the natural parents, whichever party he represented. In each instance, the attorney attempted to make sure that the party that he did not represent would obtain counsel. The ethics committee stated that "[h]is practice of seeking to have both parties to the adoption proceeding represented by independent counsel ... is clearly in compliance with the Code of Professional Responsibility...."

█ By attempting to represent the natural mother, the Pietzes, and the Buckmasters in the same adoption proceeding, respondent violated DR 5–105(A) and (B). In independent adoptions an attorney can-

not represent multiple parties absent disclosure and consent. *See* DR 5–105(C); *Arden v. State Bar of California,* 52 Cal.2d 310, 318–19, 341 P.2d 6, 10–11 (1959).

## REPRESENTING A CLIENT ZEALOUSLY

The complaint filed against respondent also charged that respondent violated DR 7–101(A)(2), which provides:

(A) A lawyer shall not intentionally:

\* \* \* \* \* \*

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102 and DR 5–105.

Respondent agreed to represent the Pietzes in an adoption proceeding if the Pietzes located a baby available for adoption. A year and a half later, the Pietzes referred an expectant mother to the respondent. Although respondent initially contacted the Pietzes with regard to adopting the child, he ultimately recommended that the natural mother consent to adoption of the child by another couple that respondent also represented. The respondent conceded that the Pietzes' credentials as adoptive parents were impressive. It appears that he chose the Buckmasters over the Pietzes because the Buckmasters resided locally, and there was a possibility he would have to travel to Cochise County to represent the Pietzes, a possibility he was not "excited" about.

Clearly, by recommending the Buckmasters over the Pietzes, respondent failed to carry out the contract of employment we have found existed between respondent and the Pietzes. We recognize that respondent may not have subjectively believed an attorney-client relationship existed between him and the Pietzes until he was confronted by Mr. Pietz after Pietz learned that someone else was to be adopting the baby. Thereafter, respondent knew, beyond any doubt, that the Pietzes had considered him as their lawyer, and they had expected him to handle the adoption.

After receiving the information from Mr. Pietz, respondent did nothing. The committee and the commission concluded that the respondent had intentionally violated DR 7–101(A)(2). We agree with their conclusion. The respondent had placed himself in the position of conflict, but he had an obligation to carry out the contract of employment with the Pietzes. Having become fully aware of the situation, the least he should have done is secure counsel for the Pietzes and withdrawn from representing any other parties in the matter.

## DISCIPLINARY SANCTION

■ The purpose of attorney discipline is not to punish the offending lawyer, but to protect the public, the profession and the system of justice by deterring similar activity by this attorney and others in the future. *In re Neville,* 147 Ariz. 106, 116, 708 P.2d 1297, 1307 (1985). We will give great weight to the recommendations of both the Local Committee and the Disciplinary Commission regarding what sanction is appropriate for violation of the disciplinary rules, but we must make the final decision. *Id.* at 115, 708 P.2d at 1306. Recently, in determining the appropriate sanction in attorney disciplinary proceedings, we also have looked for guidance to the Standards for Imposing Lawyer Sanctions, approved in February 1986 by the House of Delegates of the American Bar Association.[3] *See In re Hegstrom,* 153 Ariz. 286, 736 P.2d 370 (1987). We find these standards especially helpful in cases such as this one, where the recommendations of the Committee and the Commission are in conflict.[4]

■ The ABA standards recommend suspension when an attorney *knows* of a conflict of interest, does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client. Standard 4.32. The standards

---

3. Arizona has not officially adopted these standards.

4. Here, the Local Committee recommended censure and the Commission recommended a 30-day suspension.

recommend only reprimand (censure) when the attorney is *negligent* in determining whether a conflict of interest exists, and causes injury or potential injury to a client. Standard 4.33. From the findings of facts made by the Committee and from our review of the record, it is unclear whether respondent was *only negligent in determining* a conflict of interest existed or whether he actually knew of the conflict. Respondent testified that his only client was the natural mother. We have determined that both the Pietzes and the Buckmasters were his clients as well. If respondent did not think either the Pietzes or the Buckmasters were his clients, he would not have "known" a conflict of interest existed. However, at a minimum, respondent was negligent in failing to recognize that the potential adoptive parents were his clients and that a conflict existed. Accordingly, we agree with the Local Committee that the appropriate sanction due respondent is censure. We decline to adopt the recommendation of the Disciplinary Commission that respondent be suspended for 30 days because neither the findings of the Local Committee nor our independent review of the record unequivocally reveals that respondent knew the conflict existed. Considering also that respondent has an otherwise flawless record in the almost 30 years he has practiced in Arizona, we find the recommendation of the Commission unduly harsh. *See In re McGlothlen*, 99 Wash.2d 515, 526, 663 P.2d 1330, 1336 (1983) (court will treat conflict of interest misconduct, standing alone, with relative leniency).

## CONCLUSION

The findings of fact and conclusions of law of the Local Committee are approved.

**5.** Although this case arose under the former ethical rules, the problem does not disappear under the present rules. An attorney purporting to represent the natural mother must be aware of the inherent conflict when attempting to simultaneously represent the prospective parents. Under the present Rules of Professional Conduct, a lawyer may act as an intermediary between clients if the lawyer reasonably believes the matter can be resolved in the clients' mutual best interests, but the lawyer must make

Respondent is censured and assessed costs of $2,225.10.[5]

GORDON, C.J., and FELDMAN, V.C.J., and CAMERON, J., concur.

MOELLER, J., did not participate in the determination of this matter.

the relationship clear and must obtain each client's consent to the common representation. ER 2.2, Rule 42, Supreme Court Rules, 17A A.R.S. The lawyer may not undertake representation of clients with *directly adverse* interests unless the lawyer reasonably believes the representation of both will not be adversely affected and each client consents after consultation. ER 1.7. Thus, the lawyer must continue to proceed cautiously when attempting to represent more than one party to an adoption.