In the Matter of a Member of the State Bar of Arizona, E. Gene WADE, Respondent.

No. SB-91-0003-D.
Disc. Comm. No. 87-1101.

Supreme Court of Arizona,
En Banc.

Feb. 4, 1993.

Douglass & Ferrarino by Bedford Douglass, Jr., Mesa, for respondent.

State Bar of Arizona by William G. Vose and Mark T. Palin, Phoenix, Volunteer Bar Counsel.

## OPINION

ZLAKET, Justice.

The State Bar of Arizona charged respondent, E. Gene Wade, with violations of the Code of Professional Responsibility in effect prior to February 1, 1985. *See* former Rule 29(a), Ariz.R.Sup.Ct., 17A A.R.S. (Supp.1973–1984). A hearing committee found that respondent violated DR 5–101(A) (requiring refusal of employment where the lawyers's own interests may impair independent professional judgment), DR 5–104(A) (imposing restrictions on business relations with clients), and DR 5–105(B) (requiring refusal of employment where the interests of another client may impair independent professional judgment). It recommended suspending him from the practice of law for 30 days. The Disciplinary Commission unanimously adopted the committee's findings of fact and conclusions of law, but recommended a two-year suspension. Respondent appealed. We have jurisdiction pursuant to Rule 53(e), Ariz.R.Sup.Ct., 17A A.R.S.

## FACTS

The facts of this matter are complex. We only summarize them here. Haskell Stradling and his brothers were corporate shareholders in a family cabinet business, and he served on its board of directors. In 1968, the corporation suffered a fire loss. Respondent, voluntarily and without compensation, assisted the family in restoring the business. Thereafter, he became the corporation's attorney.

Respondent occasionally attended directors' meetings and advised the board on legal matters. From time to time, he also provided services to individual shareholders. In the mid–1970's, for example, he assisted Stradling and his wife in making a transfer of real property, for which he charged them a fee. Although no formal retainer agreement ever existed, respondent did nothing through the years to limit or terminate what appeared to be an ongoing professional relationship, nor did he communicate any desire to do so.

Stradling and his wife owned approximately 20 acres of land in Mesa, Arizona, roughly half of which was situated in the path of a proposed freeway. Respondent recommended that Stradling employ other counsel to handle the condemnation proceedings because he did not do that type of work. Stradling did so. With this single exception, Stradling did not retain an attorney other than respondent from 1968 to 1982.

In 1979, Stradling consulted with respondent about the tax consequences of the condemnation, and the tax implications of developing his remaining land. He also asked respondent about selling the rest of the Arizona property and acquiring some real estate in Missouri. They discussed the tax advantages of a three-way exchange, and respondent explained that a third party "straw man" would be necessary to effectuate such a transaction.

When respondent's son, a real estate broker, learned that Stradling was interested in selling the Arizona property, he inquired about obtaining the sales listing. Stradling was reluctant to give an exclusive listing, but agreed to pay a fee if a sale was consummated. The son consulted respondent for advice in this matter.

On or about September 29, 1979, Stradling and respondent met with Gifford, a prospective purchaser. On behalf of his development company, Gifford tendered an unsigned written "offer" in the form of proposed escrow instructions. Respondent modified some of the written terms by specifically providing for an all cash sale, and including Westward Investments as the "straw man" needed for the tax-free exchange. Westward Investments was a limited partnership created by respondent, in which his five children were the limited partners. Respondent testified that the partnership was an estate planning device for the benefit of his children.

Although Stradling was a successful businessman, he had little expertise in real estate or tax matters. Based on his past relationship with respondent, Stradling was under the reasonable impression that respondent was acting as his attorney at the

meeting with Gifford. Respondent later testified, however, that he had attended the meeting at the request of his son and was acting as Westward's attorney. He said Westward expected to make a profit on the transaction, and he was looking out only for Westward's best interests at the time. According to respondent, he was not representing Stradling, but was merely providing a "third leg" for the three-way exchange. Respondent admits, however, that he did not explain these things to Stradling. He also did not mention the potential risks associated with the transaction or advise Stradling to obtain independent legal advice.

Sometime thereafter, as Stradling and his wife were rushing to catch a plane to inspect the Missouri property, respondent presented and had them sign a document entitled "Binder Agreement For A Three–Way Exchange." This document committed the Stradlings to a selling price of $200,000 for the Arizona property, established no time limit for the sale, and provided a payment of $5,000 to Westward Investments if Gifford's company bought the property. If the Gifford sale did not occur, the agreement provided that Westward, or its assignee, would have the right to hold the property for an unspecified period of time and receive no less than $10,000 if someone else bought it. The agreement further provided that any sale had to provide enough cash to pay for the Missouri property plus Westward's profit. Once more, respondent did not explain any disadvantages or conflicts of interest inherent in the transaction, nor did he state that he was acting only as the attorney for Westward. Stradling continued to believe that respondent was acting as his attorney, and that the $5,000 designated as profit to respondent's family partnership was his legal fee. Respondent again failed to recommend that Stradling seek independent legal advice.

While in Missouri, Stradling called respondent to make sure the Arizona transaction would be completed. Respondent told him that either Gifford's company or someone else would buy the property. Stradling, acting on the impression that the exchange was set up, then placed a $10,000 purchase deposit on the Missouri property.

Sometime in October or November, 1979, respondent told Stradling that Gifford's company would not buy the Arizona property for cash, but that Westward would be willing to purchase it. He did not indicate whether Gifford had offered other terms. Stradling, who by this time was committed to the Missouri property, apparently agreed to the purchase by Westward. He testified that under the circumstances he didn't care who bought the property as long as someone did.

Respondent apparently planned for Westward to sell the Arizona property, and with the proceeds complete the Missouri transaction for Stradling. Westward did advance some funds to help close the Missouri deal. At respondent's request, the Stradlings later signed a warranty deed to Westward covering approximately half of the Arizona property (five-plus acres). Respondent back-dated this deed, which was supposed to have been "security" for the funds Westward had advanced.

Meanwhile, respondent met with Gifford, whom he had known for years, and tentatively agreed to jointly develop the Stradling property. Respondent was to provide the property, free of encumbrances, for which he would ultimately be reimbursed with interest. He also would provide free legal services to the venture. In return, respondent would receive 50% of all profits. None of this was revealed to Stradling.

When Westward was unable to come up with the balance owed on the Missouri property, respondent and his wife were substituted for Westward in the transaction and personally assumed responsibility for the amount due on the Missouri land. Respondent testified that he, more than Westward, needed the tax deductions for the interest paid on the deal. Respondent and his wife then sold the five-plus "security" acres to his sister for $100,000. Half of the proceeds were applied toward the Missouri property. The other half repaid loans previously taken so Westward could close the escrow on the Missouri property.

Much later, in 1983, respondent had Westward deed the entire 10 acres of Stradlings' property to himself and his wife. They then deeded the foregoing five-plus acres to his sister. Respondent back-dated all the deeds. In his testimony, respondent said that while Stradling had previously conveyed only half the Arizona land to Westward as security, he felt that Westward had an equitable interest in all of it by virtue of the payments made on the Missouri property.

Respondent ultimately defaulted on the Missouri obligation, forcing Stradling to borrow money to make the payments. From the beginning of 1980 through early 1983, Stradling periodically requested that respondent pay his arrearages and close the exchange. Respondent, in turn, requested that Stradling sign various forms of a "settlement agreement," which he had back-dated to 1979. Throughout this period, the exchange remained unconsummated even though prospective purchasers had offered to buy the Arizona property. By 1983, Stradling and respondent were at odds over many things, including the sales price, the effect of any sale on the completion of the exchange, and even the legal description of the Arizona property. Respondent testified that Stradling wanted to share in the appreciation of the property, and he did not feel that Stradling was entitled to do so. In 1983, respondent for the first time suggested that Stradling seek independent counsel.

The Stradlings retained another attorney. Litigation ensued, and the matter was arbitrated by agreement. The arbitrators awarded the five-plus acres to respondent's sister, most of the rest of the Arizona property to respondent, and the Missouri property to the Stradlings. They also rendered a money judgment to the Stradlings and against respondent for $89,-987.37, plus interest, as reimbursement of past and future amounts owed on the Missouri property; $20,000 in general damages for breach of fiduciary duty; attorney's fees of $27,500; costs of $615.75; and arbitrators' fees totalling $5,417.20. Finally, they ordered that the judgment would become "a lien upon that portion of the [Arizona] Property awarded to [respondent] herein."[1] The Stradlings later attempted to execute on respondent's Arizona property, only to discover that he had clouded the title by attempting to transfer it. Respondent has since filed a Chapter 11 bankruptcy petition. Stradlings' attorney filed this bar complaint against respondent in August, 1987.

## DISCUSSION

■ The State Bar of Arizona bears the burden of proving by clear and convincing evidence that respondent has violated his ethical obligations. Rule 54(c), (d), Ariz. R.Sup.Ct., 17A A.R.S. While giving deference to the findings and recommendations of the hearing committee and the Disciplinary Commission, we approach this matter as independent trier of both law and fact. *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985); *In re Pappas*, 159 Ariz. 516, 518, 768 P.2d 1161, 1163 (1988).

Respondent initially challenges this court's impartiality and its power to discipline an attorney who has filed a bankruptcy petition. He also claims that our review violates his due process rights. These issues have been thoroughly addressed in a prior disciplinary proceeding involving respondent. *See In re Wade*, 168 Ariz. 412, 814 P.2d 753 (1991) (*Wade I*). We need not do so again here. It is noteworthy, however, that in *Wade I* this court not only suspended respondent from the practice of law for four years, ordered him to make

---

1. Maricopa County Superior Court Cause No. C–517802, Award of November 12, 1986, at pages 5–6. The arbitration award was made part of the record before the hearing committee, which apparently disregarded it because the award was not yet final. The transcript of proceedings before the Disciplinary Commission does not clearly indicate whether, or to what extent, that body considered the arbitration award. We treat the award as part of the record for our review. In considering it, however, we are mindful of respondent's argument that the quantum of proof necessary to support the award may have been less than that required in a disciplinary proceeding such as this. We also note that the award has been appealed, but that the appeal has been stayed due to respondent's bankruptcy petition.

restitution, and assessed costs against him in excess of $7500, but also fined him $2000 for filing frivolous pleadings. 168 Ariz. at 426, 814 P.2d at 767. In the instant case, respondent has unfortunately pursued many of the same tactics. As reported by the commission:

> The [Hearing] Committee noted in aggravation Respondent's insensitivity to the nature and seriousness of his ethical misconduct and his disdain for this disciplinary process demonstrated both through his testimony and by filing frivolous pleadings.

Disciplinary Commission Report, November 27, 1990, at 6.

■ The record demonstrates by clear and convincing evidence that respondent violated DR 5–101(A), DR 5–104(A), and DR 5–105(B).[2] For years, respondent acted as attorney and counsellor to Stradling and the family business. An attorney-client relationship unquestionably existed. It is inconsequential that respondent did not formally "accept employment" with respect to the three-way transaction, as he now argues. The real issue is whether, under the circumstances, Stradling reasonably felt he was "dealing with a person whose advice and counsel should be given weight and respect, rather than as one whose words must be taken with that grain of salt that the law expects from people dealing with those who are not fiduciaries." *In re Neville*, 147 Ariz. at 112, 708 P.2d at 1303. Based upon their long relationship, and the circumstances surrounding the transaction, it was reasonable for Stradling to believe that respondent was acting as his attorney in the property exchange. *See In re Neville*, 147 Ariz. at 111–12, 708 P.2d at 1302–

03; *In re Pappas*, 159 Ariz. at 522–23, 768 P.2d at 1167–68.

Before entering the real estate transaction with Stradling, respondent was obligated at a minimum to disclose the divergence of their interests, the risks and disadvantages flowing from the agreement he drafted, and the need for Stradling to seek independent legal advice. *See In re Neville*, 147 Ariz. at 113, 708 P.2d at 1304. There is no evidence of disclosure or consent in this record. In fact, respondent continues to deny that he was required to disclose anything.

As previously noted, this is not the first time that respondent has come before this court on disciplinary charges. The record demonstrates that the hearing committee was unaware of respondent's prior disciplinary matter, which was still pending when the findings in this case were made. The Disciplinary Commission was aware of the earlier matter, but did not consider it in aggravation because it was not yet final. We are not so constrained, and believe that our consideration of the previous disciplinary proceeding is essential to a proper disposition here.

Respondent's conduct in this case is strikingly similar to that sanctioned in *Wade I* and demonstrates a pattern of disregard for basic and serious ethical duties. Respondent shows a propensity to insert himself into his clients' business dealings. He takes advantage of their trust, while ignoring actual and potential conflicts of interest. Such conduct not only violates the confidence vested in him by those clients, but brings disrespect upon the legal profession and the justice system as a

---

**2.** DR 5–101(A): "Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

DR 5–104(A): "A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

DR 5–105(B): "A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C)."

DR 5–105(C): "In the situations covered by DR 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

whole. It cannot be condoned. *See In re Weiner*, 120 Ariz. 349, 586 P.2d 194 (1978).

Equally alarming is respondent's continuing inability or refusal to recognize and acknowledge the wrongful nature of his actions. Instead, he has attempted to hinder and delay the investigation of his conduct and has raised the same untenable arguments previously rejected in *Wade I.*

Taking all of these circumstances together, and relying on the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986), the State Bar of Arizona has urged that disbarment is the proper sanction. We agree. Respondent was previously suspended under ABA Standard 4.32 [3] for his failure to avoid a conflict of interest. *Wade I,* 168 Ariz. at 419, 814 P.2d at 760. We believe ABA Standard 4.31, subparts (a) and (b) now apply:

> 4.31 Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):
>
> (a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client; or
>
> (b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.

Respondent's prior misconduct, his efforts to thwart the State Bar of Arizona's investigation, and his continuing refusal to acknowledge the wrongful nature of his conduct are aggravating circumstances. *See* ABA Standard 9.2. Additionally, the clients here suffered real and substantial losses.

We particularly agree with the following findings of the commission:

> The Commission finds further aggravation in the fact that Respondent shows

absolutely no remorse for his misconduct and still fails to appreciate that there was ever a conflict of interest. Further the Commission finds that the long term relationship between STRADLING and the Respondent made STRADLING particularly vulnerable [Citing ABA Standard 9.22(g) and (h)].... The Respondent's failure to appreciate the significance of his misconduct or, for that matter, his failure even to realize that there has been any misconduct makes him a danger to the public.

Disciplinary Commission Report, November 27, 1990, at 7.

The respondent is disbarred. The State Bar of Arizona is awarded its costs of $3,324.20.

FELDMAN, C.J., MOELLER, V.C.J., and CORCORAN, J.,[4] concur.

---

**3.** "Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client."

**4.** Pursuant to Article 6, § 3 of the Arizona Constitution, Judge Melvyn T. Shelley of the Arizona Court of Appeals, Division One (now retired), was also designated to and did participate in this matter, but was unable to sign this opinion due to his extended absence from the country.