782 P.2d 315

**In the Matter of a Member of the State Bar of Arizona, Jack E. EVANS, Respondent.**

No. SB–88–0055–D.

Supreme Court of Arizona,
En Banc.

Oct. 31, 1989.

Jack E. Evans, Phoenix, in pro. per.

Harriet L. Turney, Chief Counsel, State Bar of Arizona, Phoenix.

LIVERMORE, Judge [*].

In *McElhanon v. Hing,* 151 Ariz. 403, 728 P.2d 273 (1986), we held that an improper ex parte conference between plaintiff, his attorney, and the trial judge did not prejudice the opposing party. We are now required to revisit that matter on the recommendation of the Disciplinary Commission that the attorney in that case, respondent Jack E. Evans, be censured for his conduct and the conduct of his client in that conference. We have jurisdiction under Rule 53(e), Ariz.R.S.Ct., 17A A.R.S.

*McElhanon v. Hing* was a hotly contested and bitterly acrimonious case. On July 31, 1980, during respondent's cross-examination of Hing, the trial judge became upset at respondent's use of a prior deposition to impeach. The judge may have created the impression that he considered respondent's behavior unethical. On reflection the judge felt any such impression wrong and asked counsel for the opposing side, in a separate ex parte communication, if he could meet privately with respondent and his client to explain that he did not believe respondent to be guilty of any ethical improprieties. Opposing counsel consented. Respondent insisted that the proceeding be recorded. Because the nature of the resulting conference is central to our resolution of this case, we reproduce it in its entirety:

> "Phoenix, Arizona
> "August 1, 1980
> "9:50 o'clock a.m.

#### "PROCEEDINGS

"(Whereupon the following took place in chambers.)

"THE COURT: This is a conference with Mr. Evans, Mr. McElhanon and the Court with respect to certain things that came up yesterday afternoon.

"Let me say, first of all, I did read over the transcript this morning and I certainly thought quite a bit about what was said by both of us yesterday afternoon and maybe it is a result more of inarticulation more than anything, but I do not stand here and accuse you of any misconduct whatsoever. I told you yesterday that there were times where I didn't know where you were going and, therefore, I had to be careful. I did not mean to tell you or suggest to you that I did not know what general area of inquiry you wanted to get into and I don't think that was made clear at all, because my recollection of what you said in response to that was that if you—if the Court didn't know where you were going, then there was a stitch lost or something was wrong with the way the case had been presented.

"What I simply meant to say in that regard was that when a deposition was being used for whatever purpose and I couldn't be sure exactly what the purpose was, I would have to assume that it was either for impeachment purposes or refreshment of recollection—okay?—when you were using a deposition while the witness was on the stand—whatever witness.

"I feel very deeply, in a case which is as complicated as the factual setting of this case is and the legal setting of this case, that I, as the trial court, or any judge, as the trial court, ought to make every effort to insure that the case is tried once for the benefit of all litigants, plaintiffs and defendants.

"Now, this gets back to what, perhaps, was total inarticulation on my part—that is, yesterday. I did not mean to accuse you of misconduct. I have stated that, in my opinion, that particular question was, under the circumstances, not proper. Not proper does not mean misconduct.

"MR. EVANS: That was not my question.

"THE COURT: All right.

"MR. EVANS: That was Mr. Miller's question.

"THE COURT: Okay. The use of it in the setting, that's all I am saying. A state-

[*] Chief Justice Frank X. Gordon, Jr. and Justice James Moeller did not participate in this decision; pursuant to Ariz. Const. art. 6, § 3, Judge Joseph M. Livermore and Judge Lawrence Howard, Court of Appeals, Division Two were designated to sit in their stead.

ment like that—I will just tell you what my feeling was about it.

"If one of the attorneys for the defendants had Mr. McElhanon on the stand and said—used a deposition and said, 'Here's a question in here, "You have stated on two previous occasions that you didn't think what the defendants did in this case was wrong," isn't that correct?' And that came in, I think that would be an unfair taking of advantage of Mr. McElhanon or a deposition, because it doesn't specifically point out those two occasions where it is claimed that he made a statement like that.

"I think a statement like that would be devastating to Mr. McElhanon. I think a statement like what Mr. Miller said or a question or what was said, in response, by Mr. Hing, where there isn't any unequivocal—I will use that term, because it is as close as I can come to the right word—unequivocal statement somewhere else in the depositions elsewhere, it carries the same import.

"MR. EVANS: I have something to say to you and Mr. McElhanon has something to say to you.

"THE COURT: Okay.

"MR. EVANS: We have enjoyed a remarkable lack of success in presenting what we have always contended is a very obvious case. We had remarkable lack of success in getting the fraudulent conveyance set aside in Superior Court. We have always met with remarkable success on these same issues in the Federal District Court. We had 15 trials and all of them have been sustained on appeal.

"The law that has been applied in both courts, presumptively, is the same. Notwithstanding that, we always seem to run into procedural problems. Something has been misplaced. Something has been mislaid. A Judge gets disqualified. There always seems to be something that arises in this particular case that causes us to bat zero in the Maricopa County Superior Court and that really causes us concern and we are very sensitive about it—highly sensitive about it.

"And when I sit through three weeks of testimony—I see members of the Bar get on the stand, commit open and shut perjury, lie and have suppressed evidence and then I see the Court becoming distressed at me for exploring that and, apparently, facing the two lawyers, who are officers of the court, which imposes the duty on the Court, if the Court please, if there's any impropriety in their conduct, to take immediate action—the action I see taken is directed to me as opposed to the attorneys that are guilty of it—that disturbs me.

"THE COURT: You are speaking of the defendants or the lawyers?

"MR. EVANS: I am speaking of the lawyers.

"THE COURT: The advocates?

"MR. EVANS: I am speaking of the defendants.

"Now, Mr. McElhanon has something to tell you.

"MR. McELHANON: I have sat through this case and I think I have been pretty attentive to it.

"THE COURT: I know you have.

"MR. McELHANON: I think I have been attentive to what's being said and, aside from my incompetency in certain areas, per Mr. Walsh, I really feel that I have a grasp on it.

"Mr. Evans cross-examined Mr. Grace for three days and dismantled every aspect of his story with sworn testimony, either from Mr. Grace or from three or four other people, on almost every major point. Mr. Stuart took Mr. Grace on direct to try to resurrect him and for one solid day Mr. Stuart got him to remember everything that he did in 1973 on October 12 and 13. Mr. Evans then took him on cross and destroyed everything he had remembered so vividly with tons of evidence. Not one thing; everything.

"Mr. Grace came off the witness stand at recess last Thursday, walked up to me and said, 'Do you believe that stuff about me?' and I said, 'Certainly, Phil.'

"He said, 'How can you believe that?' I said, 'The evidence is all there. There's no way I cannot believe it.'

"He said, 'Do you hate me?' I said, 'Certainly not. That's ridiculous.' I said, 'Tell me why that lying Gary Stuart is programming you to lie on that witness stand, when you know that Jack Evans has the ability to dissect everything you have ever done? He's got 30 depositions here and he is absolutely carving you up. Why do you let Stuart do that to you?'

"And here is Mr. Grace's response—his exact—'I can't do anything about it.'

"He acknowledged, with that statement, that he was committing open perjury and that everything had been prearranged and I demand, right now, a perjury investigation of this case. I have had enough. In nine years I have seen them commit perjury. I have seen them doctor false entries in the books in the middle of a trial. We have had tons of evidence and the Judge directed me out on three counts and then we get $105,000 worth of canceled checks. We submit it to Judge Myers, who won't even look at them. We submit it to four other judges, that I can name; that would not consider embezzlement of $105,000 in Superior Court.

"I took them to the police department. The police department—McAfee—

"THE COURT: Kent McAfee.

"MR. McELHANON: I took them there. He didn't know what to do with them.

"I had an outside CPA and had them audit the books. We took depositions of the in-house bookkeeper and CPA and both said the money never went into the company. They professed to be totally unaware of any of the money.

"Hing and Grace were there when the Carriage Trade payments were made. The first check was $12,500. It had Southwest Restaurant Systems' name on it and the name got crossed out and they put it in their own bank account. No criminal action was taken.

"After four months in Moise Berger's office, I called and talked to Mr. Wolcott and I said, 'Mr. Wolcott, what's going on

with this evidence I brought you?' And he said, 'Well, I just got the case ten minutes ago.' I said, 'Now, isn't that interesting?'

"Then they sent it back to the police department for investigation and, in the meantime, McAfee had been transferred to South Phoenix and there was another detective involved in it.

"Then—would you believe it?—they lost the original checks. Isn't that incredible? They lost the original checks.

"I have seen so much of this. I have talked to a special prosecutor in the Attorney General's Office, who told me two judges would bite the dust, quote, unquote, over this case.

"I have been sued for slander for half a million dollars, saying that I told people judges had been bribed. Half of those witnesses that they wanted to bring in were going to come in and destroy my credibility and I tried to get an attorney, who defended that case, to subpoena those judges. I said, 'I will tell you what. You get them in here and get them under oath and see what they say, because I really don't like what I see happening and I am tired of playing footsey with them.'

"I am to the point right now where I say, let's get it all out in the sunshine. I will give you a scripture quotation: 'Men love darkness because their deeds are evil.' And when I see secrecy on this kind of a thing, I get very, very concerned.

"THE COURT: Okay.

"MR. McELHANON: And that Chinaman out there and those two crooked attorneys he's got with him—I'm talking Stuart, Walsh, Grace and Hing. Those four guys ought to be disbarred and sent to prison over what they've done in this trial and I will say that openly.

"THE COURT: All right.

"MR. McELHANON: I think there's enough evidence here that any prudent man, hearing what they have done, would return a guilty verdict. I am ready to stand up and be counted, because I have had the course.

"Judge, I have seen you sit there four days, four days, five days, four days, and you are the most attentive judge I have ever seen. You understand the facts better. You recall the testimony better. I am totally impressed with the way you handled this. I don't always agree with your rulings. Most of the time I know how you're going to rule before you rule. There are some times I disagree and I think that you are in error, but, again, I can accept what you are doing. When I see the things that are happening now, I am very concerned.

"THE COURT: Okay. What particularly? If it is directed to me, I want to know it, Mr. McElhanon. Mr. Evans brought up a point—and it's probably a valid point. I—

"MR. McELHANON: Well, I am just very concerned. I have the feeling that we are going to get D.V.'d again or that we are going to get a mistrial and, when I get that kind of a feeling—I used to walk into court with Jack Evans and tell him what was going to happen in Superior Court every time we walked in there. 'This is what's going to happen today.'

"Was I ever wrong, Jack?

"MR. EVANS: Fairly accurate.

"MR. McELHANON: All I had to do was figure out what was the worst thing that could happen to me in this case and that's what would happen. Sometimes it was taking things under advisement. We took a special action of the Supreme Court and Judge Myers ruled it all moot when he ruled on those counts the night before it was supposed to hear it.

"MR. EVANS: That's exactly right. He took a motion for summary judgment under advisement for over 90 days. I called him daily and, finally, I took a special action to the Supreme Court and, the day it was scheduled to compel him to rule, he ruled at 8:45, when we were supposed to be there at 9:00 o'clock.

"MR. McELHANON: I have been to a trial in Judge Myers' court and, aside from these turkeys that can't remember what they did two seconds ago, I can tell you names, dates and places, because I was

there—and he walked into the courtroom, poor old Judge Myers, doggone it, he forgot to schedule a jury. Well, there were three things he didn't do. He forgot to order the jury.

"MR. EVANS: Didn't order the files.

"MR. McELHANON: He didn't have the files. They hadn't been returned to his court. What was the third thing?

And the other attorneys weren't even there. One time we showed up and Phil Grace is the only attorney there and he's parked at a parking meter for a four-day trial. You think there isn't hanky-panky?

"And they sit out there—that Chinaman's wife was out there laughing and joking yesterday during recess, when Mr. Evans was in here arguing with you over his conduct. She was out there having a ball. They stand to lose everything they have and she was laughing and joking with the secretary and having a ball and I say, I really can't believe that.

"I see [another lawyer] walk in—I saw him once before in my life—and he sat in the back of the courtroom the day before last.

"THE COURT: I remember when he came in.

"MR. McELHANON: And I look at that guy and I say 'There's a guy who is impeccable.' And he sits with them, they discuss business together and everything turns sour and I am disturbed.

"Now, if we're going to get disqualified, let's get it done.

"THE COURT: You mean—

"MR. McELHANON: If you're going to disqualify us for any reason, let's go ahead and get it over with.

"THE COURT: Disqualify whom?

"MR. McELHANON: Well, I would assume it's probably because of Jack's conduct that there is going to be a mistrial.

"THE COURT: I have not stated that there's going to be a mistrial.

"MR. McELHANON: I—Your Honor, I was very, very disturbed yesterday and, when you threw your stuff down and got

up and charged out of here and I said, 'For crying out loud, what in the world did we do?' I know you have been working hard. I understand that. But I have never—and I am not saying this for flattery—I have never seen a more perceptive, understanding Judge anywhere and I have seen a few, because, unfortunately, I have had a lot of situations. I looked at the way you handled this case and I say, 'I really appreciate that.'

"THE COURT: Well, let me try to tell you something from my perspective, okay? I am no longer an advocate. I am a Judge. I can't sit here and treat McElhanon versus Hing and Grace and Greer in any other form or fashion than Plaintiff versus defendant.

"MR. McELHANON: I would not expect that.

"THE COURT: I cannot—or, at least, it is my personal feeling—the feeling that I developed over many years, not as many as Mr. Evans, certainly, as a trial advocate, that, from time to time, certain judges—not necessarily here, not presently sitting, some in other counties—felt that the case should proceed in the manner in which the lawyers felt it ought to proceed and that if someone—if one of the parties did something during the course of the case which the Judge would simply go ahead and let it in, because, after all, it's the parties' problem. It is not the Judge's problem.

"MR. McELHANON: This is one of the reasons that I am concerned that many things have come in that ordinarily should not have come in. Many objections have been sustained that I think probably should not have been sustained by—

"THE COURT: Okay. That's your feeling.

"MR. McELHANON: But I—

"THE COURT: All I want to say to you, Mr. McElhanon, and, Jack, is if there is any possibility that something may be taken out of context—and I am not saying intentionally—during final argument—and I have flagged that in my brain—and there is an objection to it during the course of final argument, we are running—we are

creating more problems at the end of the case than ought to be present.

"Now, maybe I am taking entirely too strict a view of what my role in this case ought to be, but I perceive my role in this case to insure that plaintiff and defendants get a fair trial and that the decision by the jury is based on the evidence presented in court.

"MR. EVANS: I join Mr. McElhanon's request that you, Judge, at our request, institute that inquiry which is appropriate for an examination of perjury in this case.

"THE COURT: Okay. I will then bare my soul and ask you what you wish me to do. Do you wish me to take it to the County Attorney?

"MR. EVANS: I wish you to take the transcript of Mr. Grace's testimony, followed by the cross-examination of Mr. Grace; I wish you to take the transcript of Mr. Hing's testimony, followed by what happens today; and I want you to compare those four-square and I want it also reported to the Bar Association as well as to the County Attorney. With respect to the Bar Association, I feel there is no question it is appropriate.

"I've got one more case to try after this one.

"THE COURT: Two more cases to try.

"MR. EVANS: Two more cases to try after this one, you're right, and I really dedicated 20 years to a very enjoyable practice. I don't want to leave it with a terrible distaste and a terrible distrust of those people who comprise the membership of the Bar, in general. I have watched, during the last couple of years, the attorneys in this case—and I am talking about the two defendants in this case—bring disgrace and discredit to the practice and to the profession and I intend to do something about that.

"I am asking the Court, as a member of the Bar, to institute the appropriate inquiry to see whether in the State Bar's opinion, a review of the transcript in this case reveals that there has been any impropriety on the part of the two defendants as members of

the Bar, aside from the civil consequences of this case.

"MR. McELHANON: Okay. I guess we're done.

"I'd like a copy of that transcript, please.

"THE COURT: I think, under the circumstances, it furthermore is necessarily appropriate that the defendants in this case, through their attorneys or whatever, get a copy of it.

"MR. McELHANON: Fine.

"THE COURT: Does that seem appropriate?

"MR. EVANS: It's all right with me.

"THE COURT: Let me ask you what your suggestion is that I do about what occurred yesterday afternoon?

"MR. EVANS: My suggestion is that you state to the ladies and gentlemen of the jury that yesterday afternoon there was a question asked and the specific question which was asked was reread by the court reporter here and that, in response to that question, an objection was sustained; that as a result of discussions in chambers, it appeared that the question is appropriate and, therefore, the Court is reversing its ruling and that the objection is overruled and the question may be read.

"Now, the predicate for that is that I am then going to point to where Mr. Harris told Mr. Hing that he, Mr. Hing, was aware of Mr. Harris' financial condition, as I just read it to him, on October 13, 1973.

"That's my suggestion.

"THE COURT: Okay. What I will do—well, I have already told you that I am going to allow you to pursue the issue and I was not intending to suggest, by the sustaining of the objection, that I wasn't going to let you pursue the Harris deposition. The problem that I had with the Harris deposition—the portion that was read—was, as I stated, that it did not necessarily form the predicate for the following question.

"I am going to suggest that you begin again on that area and I will make whatever apologies I think are appropriate. Okay?

"MR. EVANS: Thank you.

"MR. McELHANON: Thank you, Judge.

"(Whereupon a recess was taken.)"

Opposing counsel were then called into court, the transcript of the conference was read to them, and further argument was conducted.

■ The Disciplinary Commission found, and we agree, that this conference in part violated DR7–110(B), former Rule 29(a), Rules of the Supreme Court, which was applicable at the time of the conference. That subsection read:

(B) In an adversary proceeding, a lawyer shall not communicate, or cause another to communicate, as to the merits of the cause with a judge or an official before whom the proceeding is pending, except:

(1) In the course of official proceedings in the cause.

(2) In writing if he promptly delivers a copy of the writing to opposing counsel or to the adverse party if he is not represented by a lawyer.

(3) Orally upon adequate notice to opposing counsel or to the adverse party if he is not represented by a lawyer.

(4) As otherwise authorized by law.

Respondent contends that because the elements of the cause of action were not discussed the communication was not "as to the merits of the cause," that because the judge initiated the conference it was an "official proceeding," that the communication was "orally upon adequate notice to opposing counsel," and that the communication was "otherwise authorized by law." We reject each of these arguments.

■ The concept "merits of the cause" surely embraces more than evidence directly relating to the elements of the claim or defenses to it. As explained by the leading commentator on professional responsibility:

The Code's exception for nonmerits communications should be strictly limited to communications that are neither about the factual or legal issues in the case nor about matters that a reasonable lawyer would consider important for tactical or strategic reasons.

C. Wolfram, *Modern Legal Ethics*, at 605 (1986). McElhanon's discussion of the propriety of the judge's rulings fits within this definition. Respondent's, and his client's, assertions that opposing witnesses were lying meets even his own crabbed definition of the merits of the cause because the truthfulness of that testimony obviously relates to the merits of the claim or a defense.[1]

■ Respondent next argues that because the judge initiated the conference it was an "official proceeding." In our view, that phrase in DR7–110(B) was intended to embrace those proceedings in which opposing counsel is present. The remaining subparts of the subsection relate to permitted ex parte communications. It would be absurd to permit such communications whenever a judge was willing to hear them and thus to authorize "officially" their utterance. The judge's action was improper under Canon 3(A)(4), Code of Judicial Conduct, Rule 81, Ariz.R.S.Ct. 81, 17A A.R.S., and the resulting proceeding can hardly be characterized as "official."

We also do not believe that these communications were made orally upon adequate notice to opposing counsel. That exception did apply to the earlier part of the conference where the judge apologized for any implication of misconduct. Opposing counsel consented to that. By no stretch of the imagination can the notice given by the judge nor the consent of other counsel be held to embrace a discussion of alleged perjury by the opponent's witnesses and the propriety of prior rulings by the judge.

■ Finally respondent contends that a report of perjury by a witness was "otherwise authorized by law" because then existing DR7–102(B)(2) provided that "A lawyer who receives information clearly establishing that ... [a] person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal." Nothing in that section requires that such revelation be ex parte, and save

in extraordinary situations it may not be. In this case no clear proof of perjury was offered. Instead counsel simply argued that the opposing parties lied under oath and invited the judge to examine the evidence to see if he did not agree. If the proof could be so read, the argument was proper, but only in the presence of opposing counsel. There is authority that DR7–102(B) applies only to witnesses testifying in favor of the revealing attorney. *See* C. Wolfram, *Modern Legal Ethics*, at 658 (1986). That seems sensible. If there is evidence clearly establishing perjury by an adverse witness, then it ought to be introduced to impeach. If it is inadmissible, it ought not be brought in by an ex parte communiction designed to influence the judge under the camouflage of moral duty.

Respondent also raises a number of claims about the manner in which disciplinary proceedings were initiated against him. Because this court is the ultimate trier of fact and law in disciplinary proceedings, Matter of Petrie, 154 Ariz. 295, 742 P.2d 796 (1987), because there is no factual dispute about the conduct in question, and because no prejudice to respondent has been shown from any of the alleged irregularities, we do not reach those claims.

■ Having concluded that respondent violated a rule of professional responsibility, we turn to what sanction, if any, ought to be imposed. Given that the ex parte proceeding was initiated by the trial judge, that the portions of that proceeding we have found improper were acquiesced in, indeed encouraged, by the judge, that respondent was careful to see that a record was made of the proceeding, and that this record was made available to opposing counsel immediately after the proceeding, we conclude that no sanction is warranted. As put by Professor Wolfram:

> The purpose of the prohibition against ex parte communications is to prevent the communicating side from gaining an unfair advantage in the litigation. The

---

1. Respondent also contends that he did not cause his client to speak at the conference. He allowed him to do so and that is sufficient. When his client began to speak respondent should have stopped him and informed the judge that any such communication should be in the presence of opposing counsel.

advantage is created, of course, because the communication may influence the judge on an important decision without the absent party being able to rebut or qualify the communication as it is being made and with knowledge of the exact form in which it is made. Such contacts violate the right of every party to a fair hearing, a corollary of which is the right to hear all evidence and argument offered by an adversary. The violation is particularly acute because the calculated secretiveness of such communications strongly suggests their inaccuracy.

C. Wolfram, *Modern Legal Ethics*, at 604 (1986). By providing for a record of the communication and enabling its immediate refutation by opposing counsel, respondent prevented any of these dangers from occurring. While rules 51 and 52, Ariz.R.S.Ct., 17A A.R.S., appear to require that a sanction be imposed, we do not believe that our long-established discretionary power to determine the need for sanctions has been lost and that we must impose a sanction for any breach of any of the many rules of professional conduct, no matter how trivial that breach may be.[2]

Accordingly, the finding of violation of the local administrative committee and the Disciplinary Commission is adopted. The recommendation for sanction is rejected.

FELDMAN, V.C.J., and CAMERON and HOWARD, JJ., concur.

CORCORAN, Justice, dissenting:

I bend to the task of writing this dissent with heavy hand. We are presented with a situation that never should have occurred; hopefully, it will never occur again.

The unfortunate circumstances we face were provoked by the trial judge and invited by opposing counsel. If the trial judge had not suggested to opposing counsel that the judge have a private conference with respondent and his client, and if opposing counsel had demurred, respondent would not have been the subject of these lengthy disciplinary proceedings, and we would not be spending our precious time attempting to do the right thing in the wrong case.

The bottom line is this: The trial judge was wrong to suggest and then hold an ex parte hearing with respondent and his client; opposing counsel should have objected to the ex parte nature of the conference; respondent was right in requesting that a court reporter be present; respondent went too far in his statements to the trial judge; and respondent's client went much too far in his comments to the trial judge.

I do not agree with the majority that respondent should have "stopped" his own client from speaking. The trial judge should have controlled this proceeding and did not.

If we were to strike a balance, I would conclude that there are offsetting penalties as to everyone involved, and that because of the unique circumstances of this case, it should be disposed of in a memorandum decision, rather than a published opinion. Thank goodness that respondent, when presented with the trial judge's unorthodox request for an ex parte meeting, requested a court reporter. Else we would be arguing to this day what was said in that bizarre proceeding.

I agree with the dissenting member of the Hearing Committee who concluded that "the complaint seems to me a tempest in a teapot. And a badly tarnished teapot it is." Respondent was quite agitated and clearly outspoken in his frustration. I agree with the dissenting committee member that, although respondent and his client evidenced anguish, the record does not show an improper attempt to influence judicial conduct. I also agree with him that the standard of proof of clear and convincing evidence has not been satisfied, and that the

---

**2.** Rule 6.34 of the ABA Standards for Imposing Lawyer Sanctions provides that "Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in improperly communicating with an individual in the legal system, and causes little or no actual or poten- tial injury to a party, or causes little or no actual or potential interference with the outcome of the legal proceeding." Our Rules do not provide for an admonition. Our opinion in this matter will, however, serve that purpose.

complaint should be dismissed as lacking sufficient proof of intent to commit any improper act.

Although I do not think the drafters of DR–7–110(B) would have had in mind the peculiar circumstances of this case, I believe that respondent's conduct comes within the exceptions of subsections (1) and (3). The conference in chambers was part of the "official proceedings in the case." That is why respondent thoughtfully requested a court reporter, who immediately thereafter read the proceedings to opposing counsel. The unusual conference was held "upon adequate notice to opposing counsel", who had consented to it.

I belabor this too long. The complaint should be dismissed.