STATE EX REL. NEBRASKA STATE BAR ASSOCIATION, RELATOR, v. WALTER A. NIELSEN, RESPONDENT.

136 N. W. 2d 355

Filed July 16, 1965. No. 35578.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for relator.

Walter A. Nielsen, pro se.

Heard before WHITE, C. J., CARTER, BOSLAUGH, BROWER, and McCOWN, JJ., and WESTERMARK, District Judge.

BROWER, J.

This action was brought to discipline the respondent, Walter A. Nielsen, an attorney at law licensed and admitted to practice and a member of the Nebraska State Bar Association.

The complaint of the relator, Nebraska State Bar Association, was filed in this court by the committee on inquiry of the fourth judicial district of this state. It alleges the respondent was guilty of unprofessional conduct in two counts. The first sets out the complaint of one Betty Ivey who charged that the respondent as her attorney in a divorce proceeding received from the clerk of the district court certain checks payable to her for child support which he did not deliver to her, and that on inquiry respondent told her he had signed her name to them in order to get and apply the payments toward what she owed him. The second sets forth that the respondent, purporting to act as an attorney for his wife as the plaintiff, commenced an action for divorce against himself and acted as notary public in taking his wife's affidavit to the petition. It also alleged the respondent made certain objectionable statements set out therein to the World Herald for publication with respect to the divorce suit.

Respondent's answer in addition to a general denial alleged with respect to the first count that Betty Ivey, his client who had been denied a divorce, turned against him; that she had consented to his signing the checks in question; and that she had committed perjury in testifying otherwise before the committee on inquiry. It also asserted an attorney's lien on her funds in his possession. Concerning the second count, it alleged respondent could represent his wife in other matters and he thought he could do so in the divorce action also. The two had talked the matter over for years and there was no conflict of interest between them. It alleged the statement in the World Herald was made in a state of semiconsciousness on suddenly being awakened from

sleep induced by sleeping pills and he did not realize its import.

A referee being appointed by this court, a trial of the issues was had before him on July 24, 1964. The referee has filed herein a report of the proceeding, containing a review of the evidence, findings of fact, and conclusions of law. He found the respondent violated the Canons of Professional Ethics with respect to both counts. He found generally for the relator and submitted the matter to this court for disciplinary action.

Exceptions being filed by the respondent, the matter was argued herein and now comes on for determination. We will discuss such of these exceptions which we deem determinative of the problem before us. The respondent contends the referee erred in concluding there was sufficient evidence to warrant his findings. We will, therefore, first review the evidence with respect to the first count.

It contains many conflicting and contradictory statements made by Betty Ivey. At the trial before the referee, Betty Ivey, being called by the relator, testified she became acquainted with the respondent in October 1962 when she was desiring to discuss the possibility of a divorce. After several hearings the court ordered her husband to pay $15 a week for child support. The husband paid these amounts regularly to the clerk of the district court. The clerk made corresponding checks payable to Betty Ivey but they were sent to the respondent who forwarded them by mail or personally brought them to Betty. She had paid the respondent his full fee which she thought was $286. She first gave him $50 and afterwards $15 a week. Sometimes she gave this in cash. At other times when he brought the support check to her home she signed it and gave it to him. She said on one occasion respondent had called her by phone and she had told him to keep the checks as payment instead of coming to the house and right back again. She did not know why she made com-

plaint. At the time of filing the divorce she was too mixed up and upset by family trouble. She knew respondent would not have cashed the checks unless she had told him to. She admitted making the written complaint to the Douglas County Bar Association and appearing before the advisory committee in connection with it. She did recall the telephone conversation with respondent where she told him to endorse the checks. The gist of her testimony was that her written complaint was untrue as well as her previous testimony before the committee on inquiry. Her testimony before the referee agrees substantially with that elicited from her by the respondent as her attorney in the divorce action of Ivey v. Ivey in the district court for Douglas County on March 18, 1964.

The transcript of the previous hearing before the committee on inquiry, including certain exhibits, were admitted in evidence by stipulation of the parties made at pretrial. At that hearing, Betty, on direct examination, asserted she had never authorized the respondent to sign her name to checks nor to sign as her agent. Eight checks received in evidence were identified. She testified none of them bore her signature, she had never received their proceeds as far as she knew, and she had never authorized endorsement thereon.

Previous to the hearing at the board of inquiry, the respondent produced an affidavit dated May 14, 1963, of Betty Ivey which stated that the checks had been brought to her by the respondent, that she endorsed some of them, and later she had given respondent permission to endorse them and save him a trip to South Omaha. At the hearing before the board of inquiry she said she signed the affidavit in the presence of the respondent before a notary public at a bank in South Omaha. The respondent who had come to her house presented it to her and she had the paper to read on the way to the bank. She understood a part of it and did not understand the other parts. She stated she must

have skipped over it while talking with respondent on the way to the bank. She stated she would not have signed it if she had known it stated she had told him he could sign her name.

After Betty Ivey had testified before the referee, Margaret Wildrick, her mother, testified on behalf of the respondent. Pertinent to the issues in this court, she stated that Betty was unhappy at not receiving her support payment checks and she had thought the respondent was keeping them on fees. She had the impression her daughter had told her she had not given respondent permission to keep the checks. Betty had told her that she had gone to the bar association with a complaint so she could try and get her money back (referring to the child support).

There is evidence, moreover, that the respondent kept very incomplete records as to what and how much had been paid to him. He had never attempted to collect from the husband the $100 which had been allowed him by the court for temporary attorney's fees. No showing is made that he made demand for part or all of the fees but had merely retained the child support money. The respondent himself did not testify at the hearing before the referee. Before the board of inquiry he gave evidence stating that he had authority to sign Betty's checks and that he thought also he had an attorney's lien upon the funds belonging to his client that came into his hands.

It is evident that the testimony of Betty Ivey before the referee and in district court in her divorce trial is completely at variance with her complaint and her testimony before the board of inquiry with respect to her giving authority to endorse and cash her personal checks. The testimony shows that at the time referred to in the complaint she was without work and needed the funds to support her children. It tests credulity to suppose that, having authorized the signing and cashing of the checks, she made complaint and testified falsely. It is

significant that the respondent continued to represent her in the divorce case after the hearing before the board of inquiry. When the testimony of Betty's mother is considered, the evidence seems clear the respondent was withholding the checks rightfully belonging to and badly needed by his client.

The referee found that, giving him the benefit of the doubt, respondent had violated the following Canons of Professional Ethics, hereinafter set out. No. 11 provides: "The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client. * * * Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him." No. 29 provides in part: "* * * He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice." No. 32 provides in part: "* * * But above all a lawyer will find his highest honor in a deserved reputation for fidelity to private trust and to public duty, as an honest man and as a patriotic and loyal citizen." In this conclusion we concur.

There is little conflict with the evidence as to the second count. A copy of the divorce petition filed April 17, 1963, is in evidence. It is signed by the respondent as his wife's attorney and verified by his wife before the respondent as notary. It accuses the respondent of extreme cruelty, consisting of consorting with other women and excessive drinking. In the body of the petition it asked that the home be vested in the plaintiff and that the defendant be allowed to have his office therein for the period it may be necessary. The prayer was for plaintiff to be given possession and control of the property, the defendant to be allowed his office facility, each party to pay his own costs, and the title to the

property to remain as joint tenants. Respondent testified that there could be no conflict of interest under canon 6 of the Canons of Professional Ethics because his wife did in fact give her assent.

An affidavit of the wife states her consent was given. It avers the respondent stated he would prepare the petition, enter his voluntary appearance, make no defense, and pay the costs. Further, that title to the home should be placed in the wife and four children with a right of survival as joint tenants. The respondent was to have the right to maintain his office there as long as he was so inclined. The respondent and the affiant felt there would be no conflict of interest as a result of the arrangement. The publicity of the divorce action and the complaint against the respondent caused her to seek another attorney and file a subsequent divorce petition. A copy of the answer of the respondent in the second divorce action is in evidence. It denies the plaintiff's allegations of respondent's misconduct, asserts certain misconduct on her part, and prays the petition be dismissed.

The respondent himself did not testify at the hearing before the referee but his evidence appears in the transcript before the board of inquiry. He stated that although his wife and he were practically strangers there was no ill will between them. Although she was not familiar with the law as an attorney, nevertheless she had associated with him for years and had learned much about such matters, and fully understood the proposed representation in the divorce suit. They had talked it over for many years and there was no conflict of interest between them. In any event he felt the trial court would take care of the wife's interest and if the district court felt he should not represent her in the matter when the trial came, a "back-up" attorney would be provided to go to court with the parties and represent her in the hearing. He urged that an attorney always

took the oath of his client in the petitions and that he could do so in this instance.

The conduct of the respondent in light of both divorce actions indicates there was in truth a conflict of interest. He testified the principal reason for bringing the first action himself was that he might have firsthand and daily opportunity to dissuade her from consummating the action. It would seem the wife as plaintiff desired to be divorced and have appropriate alimony, and that the respondent preferred a reconciliation. This clearly shows their interests were directly opposite and that the respondent's true interest was not disclosed to his client.

Respondent made statements outside the record in regard to the divorce case. The evening edition of the World Herald for April 18, 1963, quotes the respondent as follows: "* * * Mr. Nielsen said he will not contest the divorce and will represent his wife 'just as though she were a complete stranger. We've been as far apart from each other as the astronauts are from the moon so I think I'll be able to try the case abstractedly.' * * * The attorney said that by representing his wife and himself he will be able to keep innocent parties from getting hurt. * * * Another lawyer 'might get careless,' he said. * * * Mr. Nielsen said his dual role should be acceptable to the court 'because I've tried over three hundred divorce cases in the last 30 years and I ought to know what I'm doing.' * * * For 'psychological' reasons he said he would ask the court to set the divorce hearing for May 24—only one day before he and his wife are to celebrate their twenty-third wedding anniversary."

The respondent testified that he was awakened in the middle of the night by a reporter calling him by phone who elicited answers to questions after awakening him from a sleep induced by sleeping tablets. The answers, he said, were given in a state of semiconsciousness without realizing their import. Respondent said he was unpleasantly surprised by the statements which appeared in the paper the next morning. He did not think the

reporter would publish them and therefore he had no intent of gaining publicity. He did not remember just what he had said and would not say he was misquoted.

The referee found that the respondent in count II violated canons Nos. 11, 29, and 32 of the Canons of Professional Ethics heretofore set out, and canons Nos. 6 and 20, hereinafter set out. No. 6 provides in part: "It is the duty of a lawyer at the time of retainer to disclose to the client all the circumstances of his relations to the parties, and any interest in or connection with the controversy, which might influence the client in the selection of counsel." No. 20 provides in part: "Newspaper publications by a lawyer as to pending or anticipated litigation may interfere with a fair trial in the Courts and otherwise prejudice the due administration of justice. Generally they are to be condemned." The respondent testified he was very familiar with the canons of ethics and that he understood them. We conclude that the referee's findings on this count are sustained by the evidence.

"In granting a license to practice law it is on the implied understanding that the party receiving it shall in all things demean himself in a proper manner, and abstain from such practices as cannot fail to bring discredit upon himself, the profession, and the courts. * * * An attorney, as an officer of this Court, must so conduct himself as to assist in maintaining confidence in the integrity and impartiality of the Court. * * * The ethical standards relating to the practice of the law in this state are the Canons of Professional Ethics of the American Bar Association which have been or may be, from time to time, approved by the Supreme Court. * * * Violation of a code of ethics or any conduct on the part of an attorney in his professional capacity which tends to bring reproach on the legal profession constitutes ground for suspension or disbarment." State ex rel. Nebraska State Bar Assn. v. Fisher, 170 Neb. 483, 103 N. W. 2d 325.

"The findings to sustain disbarment must be sustained by a higher degree of proof than that required in civil actions, yet falling short of the proof required to sustain a conviction in a criminal action." State ex rel. Nebraska State Bar Assn. v. Richards, 165 Neb. 80, 84 N. W. 2d 136.

The respondent filed an affidavit of poverty and a request for the appointment of counsel to represent him. It was denied and he contends there was error in failing to supply counsel. An action to discipline an attorney at law is not a criminal proceeding and constitutional provisions guaranteeing the right to counsel do not apply. State ex rel. Nebraska State Bar Assn. v. Richards, *supra.*

We find that the respondent has been guilty of unprofessional conduct by the violation of the particular Canons of Professional Ethics stated. Under all of the circumstances herein detailed we feel that the respondent in his conduct has utterly failed in his appreciation of the duties and responsibilities which an attorney should exercise to his client, to his profession, and to the courts.

The judgment is that the respondent be disbarred.

The costs of this proceeding, including the fees of the referee, are taxed to the respondent.

JUDGMENT OF DISBARMENT.