814 P.2d 753

**In the Matter of a Member of the State Bar of Arizona, E. Gene WADE, Respondent.**

**No. SB–90–0013–D.**
**Disciplinary Commission No. 5–2173.**

Supreme Court of Arizona,
In Banc.

July 3, 1991.

E. Gene Wade, pro se.

State Bar of Arizona by Harriet L. Turney, Chief Bar Counsel, David C. Auther and Margaret D. White, Phoenix, for State Bar.

## OPINION

CAMERON, Justice.

### I. JURISDICTION

Respondent, E. Gene Wade, was charged with violating the Code of Professional Responsibility.[1] The Hearing Committee (Committee) found that respondent violated DR 5–104 (Limiting Business Relations with a Client) and DR 9–102 (Preserving Identity of Funds and Property of a Client) and recommended that respondent be suspended from the practice of law for two years, required to make restitution, and assessed the cost of the proceedings. The Disciplinary Commission (Commission) agreed and respondent appealed. We have jurisdiction pursuant to rule 53(e) Arizona Supreme Court Rules.

---

**1.** Because respondent's conduct occurred before February 1, 1985, former rule 29(a) (Code of Professional Responsibility), rather than current rule 42 (Arizona Rules of Professional Conduct), governs his conduct.

## II. BACKGROUND

Carl Sato (Sato), respondent's client, invested in land and was a licensed Arizona real estate agent. In April 1960, Sato and Noby Yamakoshi (Yamakoshi) entered into a written co-partnership agreement called Sato & Yamakoshi. The partnership's stated purpose was to invest in Arizona real estate for the account of customers or investors. Sato was to be in charge of the accounting and operations of the partnership and Yamakoshi was to recruit potential investors in the Chicago area, where he resided. Respondent began representing Sato in the mid–1960's, when Sato employed respondent to foreclose on property in Flagstaff.

Over the years, Yamakoshi and outside investors of the partnership became dissatisfied with the performance of the partnership's real estate investments. A dispute arose as to Sato's handling of the partnership finances. Sato had, from time-to-time, advanced his own personal funds to cover partnership obligations and believed he was entitled to reimbursement from the sales proceeds of partnership property. Yamakoshi believed that Sato was diverting partnership funds to Sato's personal accounts. Respondent represented Sato in the dispute over the handling of partnership finances.

Sato's main assets were two parcels of real estate known as the Home Ranch property (sometimes called the Lehi property) and the Red Mountain property. The transactions that form the basis of respondent's ethical violations concern representing Sato in connection with these two properties. In October 1987, the State Bar of Arizona (Bar) filed a complaint against respondent charging him with two counts of ethical violations. Although there are issues common to both properties, for reasons of clarity, we consider each property separately.

## III. THE HOME RANCH PROPERTY

As a result of the dispute over the partnership finances, Sato agreed in May 1968 to pay Yamakoshi $45,954.64, the amount Sato owed to the partnership because of his alleged financial irregularities. This agreement was evidenced by a promissory note from Sato to Yamakoshi and secured by a mortgage on the Home Ranch property. At the time, the Federal Land Bank, United Bank, and Valley Bank each had a prior mortgage on the Home Ranch Property.

Sato failed to make the initial monthly payments due under the note. In October 1968, Yamakoshi sued Sato in Superior Court to foreclose the mortgage. On 10 January 1969, Sato gave Yamakoshi a $50,-000 demand promissory note. Sato then executed and delivered to Yamakoshi a quit claim deed for the Home Ranch property on 17 January 1969. In April 1969, Yamakoshi's attorney demanded possession of the property covered by the quit claim deed.

In June 1969, an accounting firm examined various books and records of Sato and Yamakoshi, and concluded that Sato owed the partnership even more than previously believed, specifically $71,171.96 as of December 1968. In April 1971, Yamakoshi's accountants indicated that Sato owed approximately $8,000 more to the Sato & Yamakoshi partnership. During this time, respondent was urging Sato to settle the dispute.

A conference was held in respondent's office on 30 July 1971 to discuss a possible sale of the Home Ranch property to raise funds to effect a settlement. According to the notes of that conference, respondent computed that, if the $50,000 note and mortgage could be settled for $34,000, the total obligations against the property (including the three prior mortgages) would amount to $67,886.40. It was suggested that the property would have to sell for $75,000 to break even. This would cover the amount of the three prior mortgages and the discounted ($34,000) Yamakoshi note and mortgage.

Respondent suggested that a sale to the S & M Trust Company (S & M) would avoid both a foreclosure and certain tax problems. Respondent and his wife held the stock of S & M, a corporation, in trust for

their children.[2]

There is no question at this time that respondent was representing both Sato and S & M.

As the respondent testified:

MR. TODD: Would you tell us your relationship to S & M?

MR. WADE: The S & M Trust Company, the stock was owned by my children, or for my children. At that time I believe they would have all been minors and I think my wife, was custodian under the Arizona Gift to Minors Act, was the owner for the children.

MR. TODD: And in that transaction, the sale of the Lehi Land to S & M, what was your role? As an attorney, who were you representing?

MR. WADE: I was representing Mr. Sato. I also would have of course, been representing S & M Trust Company. That was fully explained and understood and consented to by Mr. and Mrs. Sato. Indeed, the sale was created as an effort in the continuing effort to solve a critical legal and financial problem of Mr. and Mrs. Sato and ...

MR. TODD: Is there any writing that reflects what was discussed with the Satos in terms of—so that they made a knowing consent?

MR. WADE: Ah, there is no—nothing in writing. We had some of our, you know, memos of conversations. Mr. Palmer, through his testimony, there was, I think, a couple of those introduced into evidence.

An agreement was reached on 4 August 1971, to sell the Home Ranch property to S & M for a total purchase price of $68,-943.96. Of this amount, $34,943.96 was the amount required to pay off the first three mortgages on the property. S & M did not assume these debts, but took the property subject to them, thereby avoiding personal liability. Sato, however, remained personally liable. The agreement stated:

Seller [Sato] shall remain personally liable on the mortgages to the Federal Land Bank, United Bank and Valley National Bank; and Buyer [S & M] shall have no personal liability therefor. Buyer shall, however, use its best efforts to cause the property to be sold and the proceeds of the sale applied to pay off said mortgages as well as the mortgage created today.

For the balance of the purchase price ($34,-000), S & M gave Sato a note secured by a mortgage on the property. Monthly payments of principal and interest were not to begin for one year.

The result of this agreement was that respondent, acting as S & M, purchased the Home Ranch property for the amount of the encumbrances against it. The parties neither discussed nor appraised the property's fair market value. Sato was not advised of the consequences of remaining personally liable on the existing encumbrance, nor was he told that he should consult independent counsel, or that respondent had a conflict of interest.

Contemporaneous with this transaction, respondent had Sato and his wife execute a previously prepared letter acknowledging an obligation to pay respondent's firm the sum of $12,400 for legal fees rendered, expenses incurred, and future services at the usual hourly rate. Sato also agreed to continue his effort to find prospective buyers and perform certain services to facilitate the sale. There were no provisions for the application of any portion of the proceeds from the sale of the property towards the Satos' past or future legal expenses.

Yamakoshi's original foreclosure action was dismissed without prejudice for failure to prosecute. On 5 November 1971, Yamakoshi filed an expanded foreclosure action in the superior court. Yamakoshi sought to foreclose, as a mortgage, his 27 January 1969 quit claim deed for the Home Ranch property. This litigation was eventually

---

**2.** Also at this conference, Sato apparently indicated that he wanted to apply the profits from any sale of the property toward past and future attorney's fees. Although disputed, respondent apparently indicated that he would consider crediting Sato for past fees if the profits to S & M on resale exceeded $5,000.

settled and compromised. Evidence suggests that, at this time, respondent failed to advise Sato of certain rights in connection with these transactions, including his right to cancel the escrow set up for sale of the property.

In the interim, United Nisei Investment (UNI), a separate partnership of outside investors in Sato & Yamakoshi, instituted litigation in Chicago against Sato, Yamakoshi, and the partnership (Sato & Yamakoshi). Because of this action, Yamakoshi no longer wished to resolve his differences with Sato.

In February 1972, S & M deeded a portion of the Home Ranch property to T & G Investments, a corporation controlled by one of respondent's colleagues. The purchase price was $34,000, $8,000 payable in cash and the balance in the form of a note payable to S & M.

In mid-1983, Sato began asking respondent for an accounting of the proceeds from sales of portions of the Home Ranch property. In March 1984, Sato's son, an accountant, formally requested an accounting and other pertinent information concerning the dispositions that respondent had made of portions of the property. Some time later, respondent produced an accounting, which indicated that S & M Trust Company and related entities had realized a gain of approximately $61,984 on sales of portions of the Home Ranch property.

The attorney for the Bar, in closing argument before the Commission, noted the position in which Sato found himself:

[I]n the late '60's and early 1970's, Mr. Sato had mortgaged a bunch of parcels of property near his home with his partner, Mr. Yamakoshi, and he was at the point where he could not sell any more of these parcels because of tax laws and sub-division laws, and he was at the point during several mortgage foreclosure proceedings where he had to do something, and he was essentially in fairly desperate straits at that time. Mr. Wade, who had been his attorney throughout these proceedings, according to Mr. Sato, agreed to take the property and to subdivide it and sell it, and to account back to Mr. Sato for any of the profits after all of the encumbrances, mortgages, et cetera had been paid off. According to Mr. Wade, it was not a transfer in trust, as Mr. Sato explained it, but rather an outright sale, and Mr. Wade contended that he was entitled to keep all of the profits.

\* \* \* \* \* \*

In the end the property was sold; a substantial profit was acquired by Mr. Wade in the amount of 61,000 and some odd dollars, and Sato went back to Wade and said, several years later, you know, "You have had this property for a long time. My tax accountant wants to know how I should account for it on my income tax returns," and his accountant was his son—Mr. Sato's son. "Can you please give me some accounting? Can you please tell me how much money I made, or how much money I lost," and in the end he did obtain an accounting, and Mr. Wade still refused to account for the profits, but Mr. Wade did return some of the unsold portions of the Home Ranch Property. Again, this was a significant fact to the committee, that why would Wade return the unsold portions, if, in fact, he had purchased these properties outright. What motivated Mr. Wade to return some of the property back to Mr. Sato if, in fact, it was not a conditional sale.

■ We agree with the Bar counsel's summation of the testimony. It appears, by clear and convincing evidence, that the property was not sold to respondent (S & M), but transferred to him in trust. This was the finding not only of the Committee and the Commission, but the superior court in the later foreclosure action. Because respondent held the property in trust for Sato's benefit, respondent had an ethical and legal obligation to account to Sato for the trust status.

### IV. THE RED MOUNTAIN RANCH PROPERTY

Sato and Yamakoshi acquired the Red Mountain Ranch property early in their

partnership. On 11 March 1968, Sato delivered to Yamakoshi a quit claim deed for the Red Mountain property. In November 1971, Yamakoshi sued to have the quit claim deed foreclosed as a real estate mortgage securing Sato's debt to Yamakoshi. In May 1973, Yamakoshi filed a separate quiet title and foreclosure action with respect to the Red Mountain property, which was later consolidated with a civil action.

Apparently, there were some settlement discussions at this time. Yamakoshi's counsel secured an appraisal, which indicated that, as of October 1980, the Red Mountain property had an appraised value of $475,000, or approximately $3,000 per acre. It was proposed that the property be sold to respondent and his wife for the appraised value. The proposal expressly noted that respondent and Sato had signed a separate "side" agreement relating to the Red Mountain property.

On 15 June 1981, the parties formally entered into a "Compromise Settlement Agreement in Full and Final Release of All Claims." The agreement provided that UNI owned 66% of the Red Mountain Ranch property, Yamakoshi owned 24%, and Sato owned 10%. The property was then to be sold to respondent and his wife. As respondent testified:

I discussed the letter and the escrow instructions in detail with Mr. and Mrs. Sato in my home. Mr. Sato expressed the opinion that the property was not worth the amount of the appraisal, that they had had it for many years and had never been able to sell it, and we discussed the transaction. Both of them fully understood the proposal. They consented to it knowing that I was the purchaser of it. They were anxious that it be—that the lawsuit be settled and if it could be settled on the basis proposed, they were thrilled with the idea. They therefore signed the escrow instructions and my wife and I signed the escrow instructions.

The accompanying escrow instructions called for a total purchase price of $475,000 payable as follows: $10,000 earnest money in the form of a promissory note; $20,000 in cash at the close of escrow (which discharged the promissory note); and the deferred balance of $455,000 to be discharged through a subdivision trust agreement upon which no interest would run and no payments would commence for a period of two years. This transaction did not close until April 1982. Sato was never advised to seek separate counsel with respect to this transaction.

Following extended negotiations, Sato signed escrow instructions on 14 June 1983 agreeing to sell 60 acres of the Red Mountain Ranch property to United Development, Inc. (UDI) for $720,000, or approximately $12,000 per acre. Sato apparently advised representatives of UDI that respondent held title to the property as his attorney and would cooperate in closing the transaction.

Following the signing of the escrow, Sato and respondent held several meetings to discuss alternative proposals for defining or dividing their interest in the Red Mountain property that would permit the transaction to be completed. Respondent, however, rejected all deals and refused to join the transaction. As a result, UDI sued Sato and respondent, seeking specific performance of the escrow instructions. Sato and respondent filed third-party claims against each other.

In November 1986, a superior court judge issued findings of fact and conclusions of law in the civil action and ruled that UDI had a valid contract for the purchase of a portion of the Red Mountain property and was entitled to specific performance. The court also ruled that respondent and his wife held the property in constructive trust for the Satos and ordered them to execute any conveyances necessary to effectuate the sale to UDI. Finally, the court ruled that a portion of the Red Mountain sales proceeds be applied to discharge any amounts respondent owed the Satos from sales of portions of the Home Ranch property.

In January 1987, another superior court judge entered judgment on the third-party complaint and counterclaim in the same action, based upon a jury verdict. That

judgment awarded Sato the sum of $61,-984.30 as an accounting for sales of portions of the Home Ranch property, prejudgment interest from 28 December 1977, and attorneys fees and costs.

## V. DISCUSSION

■ In disciplinary matters we are the triers of both fact and law, *In re Mercer*, 133 Ariz. 391, 393, 652 P.2d 130, 132–33 (1982), and the standard of proof is clear and convincing evidence, *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985).

The Committee and the Commission found that respondent violated two DR's of The Code of Professional Responsibility. We will discuss the DR's separately.

1. **DR 5–104. Limiting Business Relations with a Client**

 (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein. and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

■ A lawyer must put a client's interest ahead of his or her own profit. Admittedly, a lawyer may enter into business relations with his client, but in so doing, he does not abandon his professional obligation to the client. The lawyer must make certain that the client knows to seek the advice of outside counsel. As we have noted:

> When an attorney enters into a business transaction with his client, he must not only insure that the transaction is fair, but he must also fully disclose all conflicts inherent in such dealings and all pertinent facts.

*In re Weiner*, 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978) (citations omitted).

■ We believe the evidence supports the finding that there was a conflict of interest between respondent and Sato, and that respondent did not properly advise Sato of the conflict of interest or of Sato's right to consult with an outside attorney.

Certainly there was no written notice to Sato.

In both transactions the advice of outside counsel could have benefitted Sato. In the transfer of the Home Ranch property, for example, independent counsel could have insisted that the property value be determined. Independent counsel could have advised Sato that S & M was respondent's alter ego and that respondent was making a very favorable deal for himself, with no liability, while Sato remained personally liable for the mortgages. Also, independent counsel may have insisted that Sato's attorneys fees be paid out of escrow.

■ Respondent, however, contends that Sato was not harmed by his failure to obtain outside counsel. Harm to Sato, however, is irrelevant. The fact that the client was not harmed does not lessen the requirement of full and fair disclosure to the client. "The duty to disclose is not obviated by a showing that the outcome of a transaction was fair to the client. Full disclosure of all pertinent information, including the presence of any conflicts of interest, is independently required." *Weiner*, 120 Ariz. at 352, 586 P.2d at 197. As the American Law Institute has noted:

> A lawyer's legal skill and training together with a relationship of trust and confidence required between client and lawyer, create the possibility of overreaching when a lawyer enters into a business transaction with a client. Furthermore, a lawyer who engages in a business transaction with a client might be tempted to arrange the form of the transaction or color later legal advice so as to protect the lawyer's interests rather than advancing the client's interests. Proving fraud or actual overreaching is sufficiently difficult that the law does not require such a showing on the part of the client who complains of such a transaction.

Restatement (Third) of the Law Governing Lawyers § 207 (Tent.Draft No. 4, April 10, 1991).

One of the dangers of proceeding with a client in a business venture is that the attorney-client relationship may conceal in-

stances of inadequate or adverse representation. The client, for example, might not ask relevant questions, believing his attorney will ask them if necessary. This is true even if the client, like Sato, is an experienced and sophisticated dealer in real property, capable of protecting his own interests.

In addition, the Home Ranch transaction was unfair to Sato. Sato was in financial difficulty. The purpose of the transaction was to get Sato out from under a mountain of debt. Instead, the transaction left Sato personally liable for the encumbrances without a cash flow for payment. Respondent took care of respondent and left Sato to take care of himself. Respondent violated DR 5–104.

### 2. DR 9–102. Preserving Identity of Funds and Property of a Client

DR 9–102 states:

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities or other properties.

 \* \* \* \* \* \*

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

The Committee and the Commission found that respondent violated DR 9–102(B). Respondent, however, contends:

There was no trust arrangement. Once he had sold the Lehi Land [Home Ranch] to S & M, it did not technically nor in any other sense belong to Sato. The fact that Respondent caused S & M's successors' in interest to convey portions of the Lehi Land to Sato twelve years after the S & M transaction and after the Yamakoshi litigation had settled simply shows how fairly Respondent dealt with Sato. It did not and could not create a duty under DR 9–102(B) for Respondent to account for the balance of the Land that

Sato had sold to S & M. Respondent never came into possession of Sato's property.

Respondent concedes that there was an understanding that he would return portions of the Home Ranch Property to Sato at some time in the future. The Committee noted:

This understanding was never memorialized in any writing. No competent independent counsel for Mr. Sato would have left such an important element of the transaction undocumented.

The Committee further noted:

While Respondent did eventually return the unsold portions of the property, he did not do so until well after the dispute with Mr. Yamakoshi had been settled and only at Mr. Sato's insistence. He did not produce an accounting as to the proceeds of sales of the property until quite some time thereafter, and again only at Mr. Sato's insistence, and to this day denies that he was obligated to.

We agree with the findings of the Committee and the Commission and hold that respondent violated DR 9–102.

## VI. SANCTIONS

The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) (*Standards*) guide this court in selecting the proper sanction to impose. *In re Cardenas*, 164 Ariz. 149, 152, 791 P.2d 1032, 1036 (1990). As to conflicts of interest, the *Standard* 4.32 states:

Suspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

We believe suspension is appropriate for violating this conflict of interest rule.

As to respondent's failure to return property, *Standard* 4.13 states:

Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.

The *Standards* also define and list factors which may be considered as aggravating circumstances.

9.21 *Definition:* Aggravation or aggravating circumstances are any considerations, or factors that may justify an increase in the degree of discipline to be imposed.

9.22 Aggravating factors include:

\* \* \* \* \* \*

(b) dishonest or selfish motive;

\* \* \* \* \* \*

(e) Bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency:

\* \* \* \* \* \* .

(g) refusal to acknowledge wrongful nature of conduct;

\* \* \* \* \* \*

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

The Committee found all of the above factors present, stating:

Respondent is an experienced lawyer but nevertheless engaged in at least two, and probably three business transactions with a client which were clearly disadvantageous to that client and without the requisite disclosure and consent. Throughout the course of his initial dealings with Mr. Sato once the problem was raised, and throughout these proceedings, Respondent refused to acknowledge that he had not handled these transactions in the fashion prescribed by the Code of Professional Responsibility.

Not only has Respondent been indifferent to restitution to Mr. Sato, he has actively frustrated it. Mr. Sato was compelled to resort to litigation against his former lawyer to secure relief. The efficacy of the judgments obtained by Mr. Sato as a result has now been undermined, if not wholly defeated, by Respondent's Voluntary Petition Under Chapter 11 of the Bankruptcy Code.

We give the Committee's and Commission's recommendations great weight, but we ultimately determine the sanction to impose. *In re Fresquez,* 162 Ariz. 328, 334, 783 P.2d 774, 780 (1989). As to Count One (conflict of interest), we believe that a two-year suspension is appropriate. As to Count Two (preserving identity of funds and property of a client), we believe that aggravating circumstances should raise the sanction from reprimand to a two-year suspension. Because of respondent's actions, discussed below, the sanctions shall run consecutively.

## VII. COMMENTS

We agree with both the Committee and the Commission that respondent is guilty of unethical conduct. Moreover, any lenience or mitigating factors we might have considered for sanctioning respondent were eliminated by the way he contested this matter. In his answer to the Bar complaint, respondent objected to the allegations of the Bar Counsel asserting variously: the proceedings violated Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 362; violated respondent's Constitutional civil and due process right; extortion; collusion; an undisclosed Galligher Agreement; perjury; and the failure to state a claim upon which relief can be granted. Respondent also asserted as affirmative defenses estoppel, satisfaction, Statute of Limitations, laches, release, improper party plaintiff, failure to join necessary parties, violation of due process and "other statutory and constitutional rights of due process of respondent." Although none of these defenses are, of themselves, objectionable, together they illustrate the recurring pattern of roadblocks that respondent erected to hinder the disciplinary process. Throughout these proceedings, respondent has impeded the work of the Bar, the Committee and the Commission; each had to consider many frivolous motions, all of which took its toll in time and resources spent on the matter. We mention a few of respondent's pleadings that we believe were designed to impede the progress of this proceeding. We note also that even if the respondent's allegations were correct, they had no effect on and

were immaterial to the issue of respondent's guilt or innocence of ethical violations.

### 1. Caption and Signature

██ The caption of the complaint read: "Hearing Committee J6 Disciplinary Commission of the Supreme Court of the State of Arizona." Respondent objected, claiming that the Hearing Committee is not part of the supreme court.

Respondent is partially and technically correct in that the Committee is a committee of the Arizona State Bar. *See* rule 48(e), Ariz.Sup.Ct.Rules. The Commission, on the other hand, is an arm of the Supreme Court. Rule 47(a), Ariz.Sup.Ct. Rules. (There shall be a Disciplinary Commission of the Supreme Court of Arizona.)

Respondent also complained of Bar counsel's signature because Bar counsel signed the complaint under his firm's name rather than for the Bar. As a result, a prehearing conference was held. In testimony before the Committee, respondent said:

MR. WADE: I believe that Mr. Auther has been appointed as Bar counsel, but I do not believe his firm has been appointed as Bar counsel.

MR. HENDRICKS: So your quarrel then is not with him serving as Bar counsel, but with him having added the name of his firm above his signature on the Complaint?

MR. WADE: I believe in lieu of that it should have been the State Bar of Arizona by Mr. Auther, as the signature on the Complaint. I believe the rules specifically call for it.

The Bar was granted leave to amend its complaint to cure the technical deficiencies in the signature line and caption. We believe that this cured any error. In any event, it played no part in the determination of this matter. Respondent contends, however:

[I]n spite of the fact that bar counsel was ordered by the hearing committee to amend the pleadings in the instant action because of improper captions, the bar persists in the use of these improper captions. The Bar has resumed using a caption which falsely states that these proceedings are before the "Disciplinary Commission of the Supreme Court of Arizona." The rules expressly call for a caption reciting "Before the State Bar of Arizona, Hearing Committee No. ____." Rule 55(f) R.Sup.Ct. Respondent believes that the bar employs these misleading captions for the same reason that it erroneously claims that the Commission is a non-state bar entity: the bar knows that because it is both prosecutor and judge, and because the Commission has no genuine independence from the bar, all disciplinary proceedings are inherently prejudicial and implicitly unfair to respondents.

We are not sure what all this does for respondent except to gain time while his motions are considered. If there is, or ever was, a problem in the caption, the rules specifically provide for corrections of such technical mistakes. *See* rule 54(i), 17A Ariz.Sup.Ct.Rules (Absent error resulting in a miscarriage of justice, "[n]o findings or recommendations made in any proceeding shall be invalidated because of an error in pleading, or in procedure, or upon any other ground...."). We fail to see how an error in the complaint caption resulted in a miscarriage of justice. We find no error or prejudice.

### 2. Appointment of an Attorney

Respondent sought from the Committee the appointment of counsel to represent him in the disciplinary proceedings. On the day of the Committee hearing, respondent filed with the Board of Governors several requests for relief, a motion for a judicial determination, and orders to appoint counsel and vacate all prior proceedings regarding appointed counsel.

Respondent then filed with the Commission a motion for a new order of stay in which he argued that his motion for appointment of counsel was still pending before the Board of Governors and requested a stay of one year from the date of any ruling on that motion. The Board of Governors denied respondent's request for counsel. Respondent then filed with the

Committee a Motion for New Stay and to Enforce Existing Stay, a Motion for Appointment of Counsel, and a Motion to Vacate Hearing, all of which the Committee denied. The Commission entered its formal order denying respondent's Motion for New Order of Stay. After these rulings, respondent reurged his request for appointment of counsel in almost every pleading or motion he made.

■ Although rule 53(c)(2), Ariz.Sup.Ct. Rules, provides that a respondent in a disciplinary proceeding "is entitled to be represented by a lawyer ...," we do not believe that this entitlement extends to the appointment of counsel at State Bar expense. The Bar's citation of California authority (*Marquette v. State Bar of California*, 44 Cal.3d 253, 242 Cal.Rptr. 886, 746 P.2d 1289 (1988); *Palomo v. State Bar of California*, 36 Cal.3d 785, 205 Cal.Rptr. 834, 685 P.2d 1185 (1984); *Yokozeki v. State Bar of California*, 11 Cal.3d 436, 113 Cal.Rptr. 602, 521 P.2d 858, *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 145 (1974)) is inapposite because, unlike Arizona, the California state bar has a specific statutory procedure for the appointment of counsel in disciplinary matters.[3] Cal.Bus. & Prof.Code § 6085 (West 1990); *see also Slaten v. State Bar of California*, 46 Cal.3d 48, 249 Cal.Rptr. 289, 757 P.2d 1 (1988). Moreover, representation, let alone appointment, of counsel is not an absolute right in California disciplinary matters. *See, e.g., Hyland v. State Bar of California*, 59 Cal.2d 765, 773–74, 31 Cal.Rptr. 329, 334, 382 P.2d 369, 374 (1963) (attorney who represented himself because he could not afford counsel could not, after an adverse result, assert for the first time that counsel should have been appointed for him); *Slaten*, 46 Cal.3d 48, 58–59, 249 Cal.Rptr. 289, 296, 757 P.2d 1, 8 (attorney was not denied statutory right to reasonable opportunity to be represented by counsel when record indicated that attorney's alleged mental illness was not so severe that he was unable to assist in his own defense, attorney had ample opportunity to establish right to have counsel appointed, and received notice of procedure for obtaining appointment of counsel, but failed to file completed application form).

Respondent has filed continuances, stays, motions for summary judgments, and other pleadings, and has otherwise acted competently, if unprofessionally, throughout these proceedings. His primary basis for requesting appointed counsel is his claim of indigency. We, however, share bar counsel's doubt about respondent's indigency in this case.

> It is also odd that an individual, who up until recently, had law partners, and who claims in the bankruptcy proceedings to have assets of $4,635,344 and debts of $1,016,620 cannot obtain legal assistance through reasonable efforts. Respondent has stated in the bankruptcy court that his primary asset—160 acres of real property—is worth no less than $1,400,-000 and possibly as much as $4,320,000. He has further admitted that, "the value of property or funds available after the [pending civil] appeal whether win, lose or draw is substantial ..." In appearances before the Disciplinary Commission, respondent has stated that his "net take-home pay" during the past nine months was "less than $3,000 per month." He has also disclosed that he has a positive net worth. For all these reasons, it is difficult to accept respondent's current (and selective) claim of indigency.

■ As noted above, respondent is generally entitled to be represented by counsel in a disciplinary proceeding. Rule 53(c)(2), Ariz.Sup.Ct.Rules. However, because disciplinary proceedings are not criminal prosecutions, an indigent respondent's request for appointed counsel is properly refused.

---

3. Respondent's answer to the Bar's citation of these California cases is noteworthy.

Shame on the bar and its attorneys for endeavoring to deceive the court and an unrepresented respondent and thereby violating E.R. 3.3(a)(1) and E.R. 8.4(c) in their overzea-

lous efforts to convict a brother attorney who cannot employ counsel. Such unethical tactics highlight the necessity of the court granting respondent's motion for appointment of counsel or stay until respondent can employ counsel.

*Ohio State Bar Assoc. v. Illman*, 45 Ohio St.2d 159, 342 N.E.2d 688, *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). *See also State ex rel. Nebraska State Bar Assoc. v. Nielsen*, 179 Neb. 55, 136 N.W.2d 355 (1965), *cert. denied*, 383 U.S. 105, 86 S.Ct. 718, 15 L.Ed.2d 618 (1966), and *cert. denied*, 386 U.S. 266, 87 S.Ct. 1047, 18 L.Ed.2d 52 (1967), and *cert. denied*, 389 U.S. 154, 88 S.Ct. 342, 19 L.Ed.2d 355 (1967).

### 3. Bankruptcy

 Respondent sought to convince the Board of Governors and the Commission that his petition in bankruptcy, pursuant to 11 U.S.C. § 362, automatically stayed his disciplinary hearings.

On 1 July 1988, the United States Bankruptcy Court for the District of Arizona ruled that Bar disciplinary proceedings are not subject to the automatic stay provisions and are specifically exempted under 11 U.S.C. § 362(b)(4). The United States Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling on the stay and further affirmed the bankruptcy court's dismissal of respondent's counterclaim, which sought damages for the Bar's willful violation of the stay. 115 B.R. 222, 20 Bankr.Ct.Dec. 1083 (9th Cir.BAP 1990).

A lawyer may not discharge his ethical and professional responsibilities in the bankruptcy court. There was, and is, no reason to stay respondent's disciplinary matter because of his bankruptcy petition.

### 4. Confidentiality

On 9 June 1988, the Bar filed in bankruptcy court a protective motion for relief from the automatic stay provision of the Bankruptcy Code if the Code applied to disciplinary matters. Respondent filed a response entitled "Emergency Motion for Immediate Relief and Supplement to Motions for Stay and Summary Judgment." In this motion, respondent argued that the Bar's motion for relief from stay filed in the United States Bankruptcy Court violated his right to the confidentiality of these proceedings granted by rule 61(d), Ariz. Sup.Ct.Rules. We do not agree.

Respondent initially petitioned the bankruptcy court for relief and urged that the automatic stay provision of Chapter 11 be applied to his bar matter. He may not now complain if the bankruptcy court learns of his bar charges. We find no error.

### 5. Statute of Limitations

 Respondent raises the defense of statute of limitations and laches. We have long held that the statute of limitations does not apply to bar discipline cases. *In re Bailey*, 30 Ariz. 407, 248 P. 29 (1926); *see also* rule 54(h), Ariz.Sup.Ct.Rules. Neither do we find that laches applies because of delay in processing this discipline matter. Laches does not apply when the complaining attorney cannot show any prejudice resulting from the delay. *Weiner*, 120 Ariz. at 353, 586 P.2d at 198. Respondent has failed to show any prejudice resulting from the Bar's handling of this matter. In fact, much of the delay after the filing of the formal complaint was due to respondent's incessant last-minute motions and requests for stays, continuances, and extensions of time.

### 6. Record on Appeal

Respondent's actions concerning the record on appeal indicate a last gasp, if not frantic attempt, to avoid a final decision in this matter. Rule 46(g)(15), Ariz.Sup.Ct. Rules, states:

> "Record on appeal" means the complaint and every *later-filed document*, exhibit or thing in the record.

"Later filed documents" means all documents filed after the formal complaint that relate to the matter at hand. On 1 March 1990, the disciplinary clerk transmitted to the Clerk of the Supreme Court 85 items in the record. These items included every "later filed document," but did not include files of the bankruptcy court or purely internal memoranda of the Board of Governors.

Respondent gave notice of appeal on 19 December 1989. On 8 March 1990, respondent wrote to the Clerk of the Supreme Court complaining about omissions in the

record on appeal and closing with the following:

I respectfully request that this matter not be docketed until the Disciplinary Clerk has submitted to the Court the entire record on appeal and a complete listing thereof including a listing of every item in the file of the Disciplinary Clerk regarding this matter. By a copy of this letter to the Disciplinary Clerk, I request that the Disciplinary Clerk file a complete listing of the record on appeal and submit to the court the complete record on appeal.

Also on 8 March, respondent wrote to the disciplinary clerk asking her to comply with a request made to the Clerk of the Supreme Court, stating:

I know of no reason why the Disciplinary Clerk's entire file should not be submitted to the court and every item therein listed on the record on appeal by you in chronological order.

When you have made the complete list, I would appreciate the opportunity of receiving and reviewing a copy of it, and comparing it with your file and mine to make sure it is complete before it is filed with the court.

If for any reason you do not intend to comply with the request made herein and in the enclosed letter, please promptly advise me in writing that you will not comply with the request, and I will file an appropriate motion with the court concerning the matter.

At issue here is the exclusion of the pleadings in the bankruptcy court and certain memoranda and documents the Board of Governors used in reaching their decisions. These items were not, and never have been, part of the record.

On 15 March 1990, respondent wrote to the disciplinary clerk complaining that every letter, file, or document had not been filed and ended the letter stating:

I respectfully request that, pursuant to applicable rules, you file a complete record on appeal which contains "every" later-filed document, exhibit or thing, including but not limited to those items set forth on Exhibit A. I also request that

you notify the Clerk of the Supreme Court that until these omissions are corrected, the record on appeal is not yet complete.

Respondent then listed 26 items some of which were taken from the record of the bankruptcy proceedings and were not a part of the record. The disciplinary clerk responded and, noting rule 15, indicated that only the later-filed documents would be part of the record.

Respondent then filed a motion dated 17 April 1990, entitled "Motion for Stay or in the Alternative Extension of Time" in which he again urged his motion for appointment of counsel with a motion for completion of record. Also, on 17 April, respondent filed a motion for completion of record on appeal and to vacate rule 53(e) notice, and again renewed his motion for appointment of counsel.

In its answer, the Bar points out that some of the items that respondent claims were omitted, actually were in the record attached to other exhibits. Other items concern bankruptcy, correspondence that is not a part of the record, and documents prepared for other use, including a memorandum to the Board of Governors regarding the appointment of counsel in bar matters. This memorandum was not filed because it was not prepared for these proceedings, but to assist the Board of Governors in reaching a decision.

We find no error in the filing of the record on appeal. We do find, however, that respondent's approach to the matter was offensive and unprofessional. As the Comments in the record indicate:

Throughout these disciplinary proceedings, respondent has made claims of "secret" actions taken by the Bar and has evidenced an extremely paranoid reaction to legitimate, good faith conduct by bar counsel, the hearing committee, the Disciplinary Commission, the Board of Governors, and now, the Disciplinary Clerk of the State Bar. Never once has respondent been able to provide *any* evidence whatsoever to substantiate these unwarranted allegations.

Respondent also continues to make unwarranted vituperative comments about bar counsel, the Disciplinary Clerk, and the various hearing bodies involved in these proceedings and has impugned the integrity of all. *See, e.g.,* Record on Appeal, No. 54, p. 9 (accusing State Bar of "callousness," "prosecutorial zeal," and "knowingly act[ing] in violation of the rules"); Record on Appeal No. 44, p. 4 (accusing Hearing Committee 6J of "making a mockery of the Commission's order and authority"); Record on Appeal No. 45, p. 5 (discussing the "unprofessional pressures and detriments to which he is being subjected by his peers in these proceedings"); Record on Appeal No. 64, pp. 10–11 (alleging the State Bar has "violated the public trust" and arguing that, "A strong message needs to be sent to the State Bar that it and its officers, attorneys, committees, commissions, and boards are not invested with the power of a king or powers above the law"); Motion for Completion of Record On Appeal And To Vacate Rule 53(e) Notice, p. 7 (arguing that the "altered record on appeal shows to what extent the Bar is willing to violate or disregard the rules and basic principles of due process and fair play in pursuit of its ambitions. It also shows the Bar has something to hide.").

### 7. Motion to Dismiss

After the matter had been submitted to this court for decision, the respondent filed a motion to dismiss, claiming the court had no appellate, original, or any other jurisdiction. The respondent contended:

[I]t is incumbent upon this Court to dismiss this case with prejudice for lack of jurisdiction, and exercise its power and authority to undo the system it has unconstitutionally erected and to liquidate the bar that this Court has unconstitutionally perpetrated, continued and created.

Respondent then reasserted claims previously covered in his brief. He continued to insist that all proceedings were stayed pursuant to the United States Bankruptcy Code, 11 U.S.C. § 362, despite the previous bankruptcy appellate court finding in his case that a petition in bankruptcy does not stay Bar disciplinary proceedings.

Finally, respondent contended that this court was ethically and constitutionally disqualified to hear this matter:

Attorney discipline in Arizona today is a throw back to the star chamber proceedings of the dark ages. It is in effect a system where a few powerful members of the bar have turned the practice of law into a money getting trade and have established a trade union to protect themselves by favoritism in private closed door proceedings under which, like cannibals, they select a few weak or helpless members of the profession to publicly sacrifice in order to placate the public and thereby try to prevent the impartial and lawful regulation of the profession under laws enacted by the Legislature.

For all of these reasons, this Court has no jurisdiction in this case, is ethically and constitutionally disqualified to adjudicate this case, and is duty bound to dismantle the unconstitutional system of attorney discipline as presently constituted in this state.

Both the automatic stay under Chapter 11 and the question of this court's jurisdiction, were previously briefed and argued before this court. Respondent may not now have a second chance at presenting his case. We, therefore, granted the Bar's Motion to Strike Respondent's Motion to Dismiss.

### VIII. FRIVOLOUS PLEADINGS

 In Bar Disciplinary matters, the civil rules of appellate procedure apply when not in conflict with a special provision of the Bar Disciplinary Rules. Rule 53(e)(1), Ariz.Sup.Ct.Rules (In disciplinary appeals, "[P]arties may file briefs and present oral argument *pursuant to the rules governing civil appeals.*") (emphasis added). Because the rules governing civil appeals apply to the filing of briefs in disciplinary proceedings, sanctions governing the filing of frivolous pleadings in civil appellate cases also apply in bar discipli-

nary matters. The filing of frivolous appeals or motions, or appeals or motions taken for the purpose of delay, is punishable by fine. Rule 25, Ariz.R.Civ.App.P. This rule applies equally in disciplinary matters.

We believe that the many frivolous and dilatory motions that respondent presented both below and before this court have unnecessarily burdened the disciplinary process. We therefore believe that a fine is justified. This fine is not for respondent's unethical conduct, but for his dilatory, unnecessary, frivolous, and outrageous pleadings and motions. We therefore fine respondent $2,000 pursuant to rule 25 of the Rules of Civil Appellate Procedure.

We also note that service as Bar counsel or on the Bar's Hearing Committee or this court's Disciplinary Commission is, at best, onerous. The Bar representatives in this matter had to suffer through a barrage of inartful, frivolous, and outrageous claims, motions, and procedures. We thank them for their service to the court and their steadfast support of the legal profession.

## IX. DISPOSITION

Respondent is suspended from the practice of law for four years, ordered to pay $7,616.65 in costs to the Bar, and ordered to make restitution. In addition, respondent is fined $2,000 for violating rule 25 of the Arizona Rules of Civil Appellate Procedure.

GORDON, C.J., FELDMAN, V.C.J., and MOELLER and CORCORAN, JJ., concur.